Vera SMITH, as Executrix of the Estate
of Robert J. Smith, Deceased,
Plaintiff–Appellee,

v.

DUFF AND PHELPS, INC., a corpora-
tion, and Claire V. Hansen,
Defendants–Appellants.

No. 89–7324.

United States Court of Appeals,
Eleventh Circuit.

Jan. 16, 1990.

Lord, Bissell & Brook, Edward C. Fitzpatrick, Chicago, Ill., Copeland, Franco, Screws & Gill, Richard H. Gill, Montgomery, Ala., for defendants-appellants.

Griffin Sikes, Jr., Montgomery, Ala., for plaintiff-appellee.

Before JOHNSON and EDMONDSON, Circuit Judges, and PECKHAM *, Senior District Judge.

JOHNSON, Circuit Judge:

This is an interlocutory appeal certified by the district court under 28 U.S.C.A. § 1292(b) to resolve two questions arising under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (hereinafter "section 10(b)") and Rule 10b–5 accompanying section 10(b), 17 C.F.R. § 240.10b–5 (hereinafter "Rule 10b–5"). The district court action for securities fraud under these statutes and under Alabama law has been stayed pending disposition by this Court.

## I. STATEMENT OF THE CASE

Duff and Phelps, Inc. ("Duff & Phelps") is a closely-held Chicago-based financial consulting and management firm; Claire Hansen is its president and largest shareholder. Plaintiff's decedent, Robert J. Smith, worked for Duff & Phelps as a public utilities manager in southeast Alabama from 1956 until his retirement in January 1983.[1] In 1972 and 1976, Smith accrued some 400 shares of Duff & Phelps stock. In purchasing the stock, Smith signed certain stock repurchase agreements, which provided that:

> upon the termination of the employment with the corporation for any reason, including resignation, discharge, disability or retirement, the individual whose employment is terminated ... shall sell to the Corporation and the Corporation shall buy all shares of the Corporation then owned by such individual.... The price to be paid for such shares shall be equal to the adjusted book value (as hereinabove defined) of the shares on the December 31 which coincides with or immediately precedes the date of such individual's employment.

Sometime in 1982, Duff & Phelps, through Claire Hansen, began negotiations with Security Pacific Bank, a prospective purchaser. On February 9, 1982, Smith had his 65th birthday. On November 16, 1982, Hansen travelled to Alabama to meet with Smith. Smith alleges that at this time Hansen told Smith that retirement at 65 was mandatory.[2] Thus, in December 1982, Smith retired from Duff & Phelps and, pursuant to the stock repurchase agreements, sold his 400 shares back to the company at the then-adjusted book value of $100 per share in January 1983.[3] In January 1984, Duff & Phelps reached an agreement with Security Pacific whereby the latter would purchase all of Duff & Phelps' stock for between $1,700 and $2,000 per share. On February 1 and 2, 1984, Duff & Phelps wrote two letters to Smith to apprise him that an agreement had been reached between Duff & Phelps and Securi-

---

* Honorable Robert F. Peckham, Senior U.S. District Judge for the Northern District of California, sitting by designation.

1. Robert Smith died soon after this action was filed. Vera Smith, his widow and executrix of his estate, has been substituted as plaintiff. We shall refer to both the plaintiff and the decedent as "Smith."

2. Hansen denies making this statement. The retirement age for Duff & Phelps employees was in fact 70.

3. After his retirement Smith continued to work for Duff & Phelps as a consultant until the termination of his consulting contract on April 30, 1984.

ty Pacific; neither letter disclosed the per-share amount negotiated for the stock exchange. Although this agreement never came to fruition, Duff & Phelps ultimately established an "Employee Stock Ownership Trust" (ESOT) in December 1985. Employees sold their outstanding Duff & Phelps stock to the trust for $2,065.69 per share.

On August 12, 1987, Smith filed suit in district court against Duff & Phelps and Hansen. The complaint alleged that Hansen had fraudulently coerced Smith into retiring early by failing to disclose to him the negotiations with Security Pacific and by misrepresenting to him that the mandatory retirement age was 65. Smith stated causes of action pursuant to section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act ("RICO")[4], and Alabama state law.

On November 3, 1987, and February 1, 1988, Duff & Phelps made separate motions for summary judgment. The November 3 motion contended that summary judgment should be granted because the two-year statute of limitations under Alabama law barred the suit. The February 1 motion maintained that summary judgment should be granted because Duff & Phelps had no duty to disclose the negotiations with Security Pacific. The district court denied both motions on April 13, 1988. Duff & Phelps moved for reconsideration on June 17, 1988; that motion was denied by order of November 10, 1988.

On October 31, 1988, Duff & Phelps moved to certify the April 13 order denying summary judgment and the November 10 order denying reconsideration for interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b). The district court found that the issues of statute of limitations and duty to disclose were "controlling questions of

law as to which there is substantial ground for difference of opinion" and certified the questions for immediate appeal on November 10, 1988. On May 1, 1989, this Court granted certification.

We consider two issues on this appeal. First, we consider whether the statute of limitations period for violations of section 10(b) and Rule 10b–5 is determined by analogy to state or federal law, and when the period begins to run. Second, we consider whether a corporation has a duty under the federal securities laws to disclose to a stockholder-employee facts which might indicate that the stock is worth more than the contractually determined book value when a stockholder-employee has a contractual duty to sell his stock back to the corporation at the termination of his employment for that book value.

## II. ANALYSIS

### A. *Statute of Limitations*

#### 1. Source of Limitations Period

■ Section 10(b) does not provide for a statute of limitations on securities fraud actions. The parties suggest two different limitations periods which they claim are applicable to Smith's Rule 10b–5 action. Smith asserts that the law in this Circuit requires the Court to borrow the most analogous state law statute of limitations. Duff & Phelps urges the Court to adopt a uniform statute of limitations for all section 10(b) and Rule 10b–5 claims, as did the Third Circuit in *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3rd Cir.) (*en banc*), *cert. denied sub nom. Vitiello v. I. Kahlowsky & Co.*, — U.S. —, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988).[5]

The Eleventh Circuit has held that the statute of limitations for section 10(b) claims is the period that the forum state

---

**4.** The district court dismissed the RICO claim on October 23, 1987.

**5.** In *In re Data Access Systems Securities Litigation*, the Third Circuit opted to abandon the "analogous-state-statute" approach in favor of referring to a mix of analogous sections in the Securities Exchange Act itself. In so doing, the court purported to follow the Supreme Court's rationale in *Agency Holding Corp. v. Malley-Duff*

*& Associates*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The Third Circuit concluded that the statute of limitations for violation of section 10(b) and Rule 10b–5 is "one year after the plaintiff discovered the facts constituting the violation, and in no event more than three years after such violation." *Data Access*, 843 F.2d at 1550.

applies to the most closely analogous state claim. *Durham v. Business Management Associates,* 847 F.2d 1505 (11th Cir.1988); *Friedlander v. Troutman, Sanders, Lockerman & Ashmore,* 788 F.2d 1500 (11th Cir.1986); *Kennedy v. Tallant,* 710 F.2d 711 (11th Cir.1983); *Diamond v. Lamotte,* 709 F.2d 1419 (11th Cir.1983). It is clearly settled in this Circuit that "one panel of the Court is not permitted to overrule a decision by a previous panel unless the Court overrules the earlier decision by an en banc proceeding." *Minor v. Dugger,* 864 F.2d 124, 126 (11th Cir.1989); *see also Greensboro Lumber Co. v. Georgia Power Co.,* 844 F.2d 1538, 1541 (11th Cir.1988); *cf. Bonner v. City of Prichard,* 661 F.2d 1206, 1212 (11th Cir.1981) (*en banc* Court can overrule its own precedent). The *en banc* Court has not overruled *Durham, Friedlander, Kennedy,* and *Diamond,* which hold that state securities laws are the most analogous statutes to section 10(b). Therefore this Court may not now overrule those cases and adopt the Third Circuit approach.[6] Accordingly, the statute of limitations to be applied by the district court to Smith's section 10(b) and Rule 10b–5 claim

is the period of limitations prescribed by the closest analogous state statute.

2. Applicable Alabama Statute[7]

The April 13, 1988 order certified by the district court states that "[t]he parties agree that the two-year statute of limitations period found in section 6–2–38 of the Code of Alabama applies both to the state and federal claims." *Smith v. Duff and Phelps, et al.,* No. 87V–789–N (order denying motion for summary judgment) (N.D. Ala. April 13, 1988). Section 6–2–38, however, is the statute of limitations applying to various torts, including wrongful death, malicious prosecution, seduction, libel or slander, recovery of wages, and master-servant. The statute apparently applies to fraud, although it does not explicitly mention fraud. *See* Ala.Code § 6–2–38 (1989) (annotations following text). This Circuit has consistently held that state securities laws are most analogous to section 10(b), *see Durham, Friedlander, Kennedy,* and *Diamond, supra,* and we held in *Durham* that Ala.Code § 8–6–19(a)(1)(2) is the proper statute to analogize to section 10(b). 847 F.2d at 1508.[8] The limitations period

---

**6.** Duff & Phelps argues that this Court can review its own precedent to keep the Circuit case law in line with Supreme Court holdings. Duff & Phelps thus maintains that this Court should adopt a uniform statute of limitations in light of *Malley–Duff, supra,* n. 3, and *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Neither of those cases directly applies to the present case. *Malley–Duff* adopts a uniform statute of limitations for RICO actions. *Wilson* holds that courts should adopt analogous state personal injuries statutes for section 1983 cases. Neither case requires this Court to overrule its prior holdings.

**7.** In its March 20, 1989 order certifying the questions to be presented on appeal, the district court certified both the April 13, 1988 order and the November 8, 1988 orders. Thus, although the main question to be resolved on appeal is whether a federal or state limitations period applies to Smith's action, this Court is also empowered to determine when the limitations period begins to run and whether genuine issues of material fact remain on the issue. *See Ducre v. Executive Officers of Halter Marine, Inc.,* 752 F.2d 976, 983 n. 16 (5th Cir.1985) ("it is not merely the controlling question of law which is certified for appeal; it is the entire *order* entered by the trial court"); *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 246 (7th Cir.1981),

cert. denied sub nom., *Nuclear Engineering Co., Inc. v. Fahner,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982) ("all questions material to the order are properly before the Court of Appeals"); *Murphy v. Heppenstall Co.,* 635 F.2d 233, 235 n. 1 (3rd Cir.1980), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982) ("On a Section 1292(b) appeal we consider all grounds which might require a reversal of the order appealed from."); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 994–95 (2nd Cir.1975), *cert. denied sub nom., Bersch v. Arthur Andersen & Co., I.O.S., Ltd.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975) (broad scope of review encompasses entire order).

**8.** Section 10(b) prohibits the use of "any manipulative or deceptive device" in the sale or purchase of securities, as well as prohibiting the violation of any SEC rules promulgated to protect investors. Rule 10b–5 makes it unlawful for anyone to "make any untrue statement of a material fact or to omit to state a material fact", or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," while engaging in the purchase or sale of securities. The Alabama securities statute imposes sanctions against anyone who "[o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact."

for Ala.Code § 8–6–19(a)(1)–(2) is also two years. *See* Ala.Code § 8–6–19(e). Under either statute, the applicable limitations period is two years.

While Alabama law governs the length of the limitations period, federal law determines at what point the limitations period begins to run. *Durham,* 847 F.2d at 1508 (citing *Osterneck v. E.T. Barwick Indus., Inc.,* 825 F.2d 1521, 1535 (11th Cir. 1987), *aff'd sub nom. Osterneck v. Ernst & Whinney,* —— U.S. ——, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989)). Under federal law, the statute of limitations begins to run "when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered the alleged violations." *Id.* (citing *Kennedy v. Tallant,* 710 F.2d at 716; *Diamond v. Lamotte,* 709 F.2d at 1420 n. 1)).[9]

### 3. Propriety of Summary Judgment

The district court order denied Duff & Phelps' motion for summary judgment. The court found that the questions of whether the plaintiff exercised due diligence and whether the February 1 and 2 letters should have signalled to the plaintiff that there might be fraud were questions of material fact to be determined by a jury. This conclusion is correct.[10]

A motion for summary judgment requires the court, construing the evidence in the light most favorable to the nonmovant, to determine whether any genuine issue of material fact exists. Fed.R.Civ.P. 56(c). In the present case, the following facts are undisputed: Smith received two letters, one on February 1, 1984, addressed to him personally and sent from the vice president of Duff & Phelps, and one on February 2, 1984, addressed to the clients of Duff & Phelps and sent from president Hansen. Both letters explained that Security Pacific had agreed to acquire Duff & Phelps in a few months' time, but neither informed the reader that the deal provided for Security Pacific to purchase Duff & Phelps stock for between $1,700 and $2,000 per share. Such details were, however, recounted in various Wall Street Journal articles in 1984 and 1985. Smith received the Wall Street Journal at his office. In March 1987, Smith read a newspaper article recounting the details of employee-stockholder suits against Duff & Phelps arising out of the Security Pacific transactions.

Duff & Phelps argues that Smith should have known of the alleged fraud in February 1984, when he received the two letters. Further, they argue that because Smith read the Wall Street Journal, he should have seen the articles concerning the merger, specifically concerning four other employee-shareholder suits filed in 1984, and been put on notice at that time. Finally, they argue that Smith did not exercise due diligence because he failed to make inquiries about the price offered by Security Pacific after receiving the letters and reading the articles. Thus Duff & Phelps contends that the statute of limitations ran sometime around February 1986, and that Smith's August 12, 1987 suit was barred by the statute of limitations. Smith argues that he did not become aware, and had no reason to be aware, that the price he received for his stock was fraudulently low

---

**9.** The district court found that the limitations period was tolled by Ala.Code § 6–2–3, which states that a claim accrues when the aggrieved party discovers the fact constituting fraud. This is incorrect under *Durham.*

**10.** Duff & Phelps argues that under Ala.Code § 6–2–3, Smith must prove that Duff & Phelps fraudulently prevented the discovery of the fraud. Duff & Phelps derives this rather odd proposition from a case entitled *Prather v. Neva Paperbacks, Inc.,* 446 F.2d 338, 341 (5th Cir. 1971), and from an Alabama case. Alabama law does not control the question of when the limitations period begins to run; thus section 6–2–3 does not apply in this case. *Durham,* 847 F.2d at 1508. Further, while *Prather* does state that "fraudulent concealment of a cause of action by the defendant will toll the statute of limitations," the footnote to that sentence states that "[t]his doctrine, which is applicable to any cause of action, should not be confused with the doctrine applicable where the gist of the action itself is fraud, and the concealment is inherent in the fraud." *Prather,* 446 F.2d at 341 n. 2. Because securities fraud under section 10(b) and Rule 10b–5 is itself an action in fraud, and because concealment is inherent in that action, the doctrine of fraudulent concealment does not apply.

until he read an article in the Wall Street Journal on March 20, 1987. Thus he argues that the statute of limitations did not run until March 1989.

It is clear from these conflicting positions that a genuine issue of material fact remains regarding whether the February 1984 letters and the various Wall Street Journal articles would have put a reasonable person on notice of fraud and whether Smith exercised due diligence in determining whether he had been defrauded. Such questions are best resolved by the jury. For this reason, we hold that the district court correctly denied Duff & Phelps' motion for summary judgment on the statute of limitations ground.

## B. *Duty to Disclose*

### 1. Background

■ Section 10(b) and Rule 10b–5 clearly forbid the omission of material fact in connection with the purchase or sale of any security. The Supreme Court has held that information concerning merger negotiations may constitute material fact if it would be considered significant to the trading decision of a reasonable investor, even if the parties to the proposed merger have not established an agreement-in-principle regarding price and structure. *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 986, 99 L.Ed.2d 194 (1988).

The district court's certification does not ask us to decide whether the information about the Security Pacific merger negotiations was material and was required to be disclosed. For the purposes of our discussion, we assume (but do not decide) that, but for the stock repurchase agreements, Duff & Phelps would have had a duty to disclose the negotiations when the company repurchased Smith's shares. We are deciding only whether that duty extended to Smith despite his contractual obligation to sell back the stock when he retired. This is a question of first impression before this Court.

### 2. The "No Duty to Disclose" Approach

Duff & Phelps argues that we should follow the decisions of the Second, Sixth, and Eighth Circuits and hold that the duty to disclose does not extend to employee-shareholders in Smith's position. In *The Toledo Trust Co. v. Nye,* 588 F.2d 202 (6th Cir.1978), the corporate by-laws of Lantana Flower Farms stated that the company could repurchase shares upon the death of the shareholder within 30 days after notice of death for the fair market value per share at the end of the month immediately preceding the exercise of the repurchase option. *Id.* at 211. The decedent, a minority shareholder, died holding 143 shares. The estate finally sold the shares back to Lantana at $104.90 per share, or a total of $15,000. *Id.* at 204. Lantana subsequently sold its stock to United Fruit Company for $2,600,000. *Id.* at 205.

The plaintiff's estate sued under section 10(b) and Rule 10b–5, claiming that the plaintiff was coerced into selling the shares back to Lantana before the United merger for less than their full value. The Sixth Circuit concluded that because the plaintiff had no control over the event which triggered the restriction—death—Lantana had no duty to disclose the possible merger. *Id.*

In *St. Louis Union Trust Co. v. Merrill Lynch, etc.,* 562 F.2d 1040 (8th Cir.1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978), the Merrill Lynch Certificate of Incorporation stated that upon the death of a stockholder, the corporation had the option to repurchase the stock for 90 days after notice of death. *Id.* at 1045. The plaintiff's estate sold the stock to Merrill Lynch at $26.597 per share, the net book value at the end of the month plaintiff died. Six months later, Merrill Lynch went public, and after a three-to-one stock split, offered its shares at $28 per share. The plaintiff's estate argued that the pending decision to go public should have been disclosed. *Id.* at 1044. The Eighth Circuit held that because there was no improper motive on the part of Merrill Lynch in abiding by the restriction, Merrill Lynch's failure to disclose was not a fraudulent omission. *Id.* at 1053.

In *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444 (2nd Cir.1971), *cert. denied*, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), J. Walter Thompson repurchased Ryan's stock upon his retirement at the net asset value of $276,200 pursuant to a stock restriction.[11] J. Walter Thompson then went public with some of its shares. *Id.* at 446. The Second Circuit found that because the contractual provisions obligated Ryan to sell his shares, the corporation's plans to go public were irrelevant to the repurchase. Therefore, the court found no section 10(b) or Rule 10b–5 violations. *Id.* at 447.

### 3. The "Duty to Disclose" Approach

In *Jordan v. Duff & Phelps*, 815 F.2d 429 (7th Cir.1987), *cert. denied*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988), the Seventh Circuit held that Duff & Phelps did have a duty to disclose before repurchasing an employee's stock. *Id.* at 434. Bound by the same repurchase restriction as the one involved in the present case,[12] Jordan decided to resign from his position at Duff & Phelps. He received $123.54 per share, or a total of $23,225.00 for his stock, the book value as of December 31 the year of his resignation. He immediately discovered that Duff & Phelps had merged with Security Pacific. If Jordan had resigned after the merger, he would have received a total of $452,000 in cash and possibly $194,000 more in "earn out" (a percentage of Duff & Phelps profits paid to former investors). *Id.* at 932–33. The Seventh Circuit found that Jordan, unlike the plaintiffs in *Nye* and *St. Louis*

Union Trust, was free to choose when to leave Duff & Phelps, and so was free to leave on a date when the adjusted book value of his stock was the highest. The court reasoned that Jordan's decision to leave was an investment decision as surely as if he had chosen to sell a publicly held stock. *Id.* at 437. For this reason, the Seventh Circuit held that Duff & Phelps had a duty to disclose material facts to Jordan.

### 4. Rationale for Adopting the "Duty to Disclose" Approach

There is an important distinction between the cases advocating the "no duty" approach and the *Jordan* case: the plaintiffs in *Nye* and *St. Louis U. Trust* had no control over whether to trigger the repurchase options; the plaintiff in *Jordan* did have such control. Both the *Nye* and *St. Louis* courts recognized this distinction.[13]

The control distinction is critical. In most ways, an employee investor is no different from a public investor. Both hold stock presumably because of its potential to increase in value.[14] Both pay for that stock. Both are entitled under the securities laws to trade on the same footing with other investors. The difference between a public investor and an employee investor becomes evident at the termination of the employee's association with the company. When an employee leaves the company for any reason, that employee is contractually obligated to sell back company stock at a pre-determined and agreed-upon value.[15] A public investor has no such contractual obligation, because his ownership of the

---

**11.** The Second Circuit did not recount the contents of this stock restriction contract.

**12.** *See* p. 1568, *supra*.

**13.** The Sixth Circuit refused to rule on the control distinction, 588 F.2d at 208–09, and the Eighth Circuit cast doubt on it in a footnote, 562 F.2d at 1053 n. 18. Only the Second Circuit case disregards the distinction; Ryan voluntarily retired and the Court held that there was no duty to disclose.

**14.** An investment by definition is "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is

led to expect profits solely from the efforts of the promotor or a third party...." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946).

**15.** The rationale behind such a contractual obligation is obvious. A closely-held corporation would cease to be closely held if employees could sell or bequeath their stock to outsiders. The contract insures that the stock will remain under corporate control. Because the corporation is the only potential buyer at the time of termination, it also has the luxury of establishing the sale value of the stock, and the employee may either agree to that value or refuse to purchase the stock.

stock is not contingent upon his fulfilling the condition of employment.

Contractually-agreed-upon formulas such as book value, however, fluctuate with changing market conditions. An acquiring outside corporation may pay a higher book value to stockholders than the corporation being acquired. Such fluctuations are irrelevant when a contractually-obligated employee dies; the fact that the book value might be higher in two months or two years has no effect on the date of death. Similarly, when an employee is terminated for good cause, the fact that the stock may have an increased value at a later date does not affect the fact that the employee's performance warranted dismissal. For these reasons, there appears to be no reason to require a corporation to disclose material facts to employees in situations where the employee had no control over the circumstances of termination.[16]

The same is not true, however, when an employee resigns or retires. The fact that stock value is likely to escalate or plummet at a given time may have a great deal of impact on when an employee chooses to leave the enterprise and cash in his shares. The decision to resign or retire is as much an investment decision under these circumstances as a decision to buy or sell public stock. When an employee investor chooses to leave the enterprise, the securities laws mandate that he be provided any information material to the exercise of that choice.

Duff & Phelps argues, in a sense, that the employee waives his section 10(b) and Rule 10b–5 protections when he signs the contract agreeing to sell at book value.

Such result is inequitable in light of the corporation's rationale for its reluctance to disclose. As the Seventh Circuit noted in *Flamm v. Eberstadt*, 814 F.2d 1169 (7th Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987), premature disclosure of merger negotiations to the public could spark competition that might drive down bids, or could make potential bidders reluctant to make offers at all. *Id.* at 1176. Disclosure to an employee of a closely-held corporation, however, is not disclosure to the public. *Jordan*, 815 F.2d at 424. Such disclosure raises no specter of unwanted competition and trade. Thus, the Duff & Phelps non-disclosure approach would produce the anomalous result that public corporations, which have a justifiable reluctance to disclose, must disclose under section 10(b), while closely held corporations, which appear to have no justifiable reason not to disclose, need not do so.

In fact, it seems that the only reason a closely-held corporation would be reluctant to disclose merger information to potential retirees who hold its stock is its fear that if the retirees knew of the possible merger, they would wait to retire until they could get the largest return, thus depriving the majority shareholders of larger profits. Failure to disclose under these circumstances is a prime example of officers or majority shareholders in exclusive possession of possibly material information acting to further their own financial gain at the expense of other stockholders. Such corporate opportunism flies in the face of the general rule that "[i]t is a breach of duty for ... directors to place themselves in a

---

**16.** Duff & Phelps argues that the issue of control is simply smoke and mirrors, because it could have fired the plaintiff and accomplished the same result that it achieved by simply enforcing the contract upon retirement. The Seventh Circuit rejected this notion:

We do not suppose for a second that if Jordan had not resigned on November 16, the firm could have fired him on January 9 with a little note saying: "Dear Mr. Jordan: There will be a lucrative merger tomorrow. You have been a wonderful employee, but in order to keep the proceeds of the merger for ourselves, we are letting you go, effective this instant. Here is the $23,000 for your shares." Had the firm fired Jordan for this stated rea-

son, it would have broken an implied pledge to avoid opportunistic conduct. It may well have been that Duff & Phelps could have fired Jordan without the slightest judicial inquiry; it does not follow that an opportunistic discharge would have allowed Duff & Phelps to cash out the stock on the eve of its appreciation.

*Jordan*, 815 F.2d at 439. The Seventh Circuit reasoning appears correct: it seems highly unlikely that Duff & Phelps could legitimately dismiss an employee in order to avoid having to disclose material facts to that employee. Thus, the issue of control is an important factor in determining whether a closely-held corporation owes a duty of disclosure to its employees.

position where their personal interests would prevent them from acting for the best interests of those they represent." *Dixmoor Golf Club v. Evans*, 325 Ill. 612, 156 N.E. 785, 787 (1927); *see also Junker v. Crory*, 650 F.2d 1349, 1356 (5th Cir.1981) (under Louisiana law, corporate officers and directors owe a fiduciary duty to the shareholders). It is a violation of fiduciary principles to allow a corporation to require employees to contract away their right to make a return on their investment. There is no rational justification for requiring an employee to waive his right to disclosure of material information simply because he holds stock in his employer's company.

### III. CONCLUSION

The statute of limitations for Smith's securities fraud action is two years from the date that he discovered or in the exercise of reasonable diligence should have discovered the violations. Furthermore, Duff & Phelps had a duty to disclose to Smith any material facts which Duff & Phelps would have had to disclose in the absence of the stock repurchase agreements. The district court's denial of summary judgment is AFFIRMED, and the case is REMANDED for further proceedings in accordance with this opinion.