The **NATIONALIST MOVEMENT, a Mississippi non-profit corporation incorporated in Georgia, Plaintiff–Appellant,**

v.

The **CITY OF CUMMING, FORSYTH COUNTY, GEORGIA, Forsyth County Board of Education, Defendants–Appellees.**

**No. 89–8417.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 2, 1990.

Richard Barrett, Jackson, Miss., for plaintiff-appellant.

Gordon S. Smith, King & Spalding, S. Samuel Griffin, Atlanta, Ga., for City of Cumming.

Robert S. Stubbs, III, McVay & Stubbs, Canton, Ga., for Forsyth County, Georgia.

Sam S. Harben, Jr., Harben & Hartley Law Firm, Gainesville, Ga., for Forsyth County Bd. of Educ.

Before FAY and COX, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

This case arose out of the efforts of a group called The Nationalist Movement to conduct a parade and rally in Cumming, Forsyth County, Georgia, in January 1989. The Movement had held a parade and rally in Cumming in January 1988 to express its opposition to the federal holiday commemorating the birthday of Dr. Martin Luther King, Jr. It wished to hold a similar parade and rally on January 21, 1989, the date of the King holiday, in order to again express its opposition.

To carry out its plan the Movement applied for permits from three distinct public bodies: the City of Cumming, Forsyth County, and the Forsyth County Board of Education. During months of negotiations the details of the proposed event changed from time to time, and several amendments, suggestions, and alternatives were considered, but the major thrust of the plan ran this way: the Movement proposed that participants assemble on the grounds of the Forsyth County High School in Cumming, march along a public street to the county courthouse square, and there conduct a rally and speeches for one and a half to two hours. When the rally ended participants were to march back along the same route to the high school and disperse.

Initially the events were planned for Saturday afternoon, January 21. The Movement applied to the Superintendent of Education for permission to assemble on the high school grounds. It applied to the City Administrator for a permit to parade along a designated street, going to and coming from the courthouse square, and it applied to the County Administrator for a permit to conduct a rally on the courthouse steps.

The Movement was not successful in securing permits on terms and conditions agreeable to it. After an initial denial (until the Movement could show that it had an assembly point for the rally off the right of way of the street), the City Commission granted a parade permit for a parade to commence at 1:00 p.m. on Saturday, January 21, from the high school, to proceed to the courthouse, and to return. The City refused to close all traffic on the street during the parade and limited the Movement to the use of only one lane of the two-lane street.

After receiving this authorization, the Movement decided to change the time of its event in Cumming. It scheduled a rally in Atlanta for the afternoon of January 21 and received authorization from the City of Atlanta to conduct it. The Movement then sought to shift events in Cumming to Saturday morning, beginning at 9:00 a.m., planning to inform participants there of the Atlanta events and to urge them to attend. The City declined to change the authorized parade time because of the following provision of the City Parade and Assembly Ordinance.

[N]o private organization or group of private persons may use the roads immediately adjacent to and those roads which lead directly to the Forsyth County Courthouse grounds for private purposes of holding a parade, assembly, demonstration, or other similar activity on any non-holiday weekday prior to 8:00 a.m. or after 5:00 p.m. *or on any Saturday,* Sunday, or public holiday *prior to 1:00 p.m. or after 5:00 p.m.*

City Amended Parade and Assembly Ordinance, § 6(g) (emphasis added).[1]

On December 30, 1988, the County approved the Movement's application for a rally on the courthouse steps and grounds

---

1. This provision was enacted as part of an Amended Ordinance adopted October 1, 1987. Interpretation of this language at the hearing in a dialogue between the court and counsel for the City, Rec. III, at pp. 208–209, proved somewhat murky. But the "Saturday morning ban," which limits a parade on the streets on a Saturday to the hours between 1:00 p.m. and 5:00 p.m. is clear.

lasting from about 8:00 a.m. to 11:00 a.m. on January 21, subject to the payment of a $100 application fee. A few days later, the Board of Education gave its consent for the participants to assemble on January 21 at the high school, conditioned first upon the Movement's obtaining permission from the City and County to conduct its parade and assembly and, second, on the requirement that the premises not be damaged or littered.

While continuing to negotiate with the City about the timing of the event, the Movement discussed with a lawyer for the Board of Education an alternative authorization to use the high school parking lot for its rally and speeches in the event the parade and the rally at the courthouse were "interfered with." It is uncertain whether this request was ever presented to the Board or was merely discussed with its counsel, but, in any event, approval to conduct a rally and speeches on school grounds was not given.

On January 19 the Movement filed suit in the district court for the Northern District of Georgia seeking a temporary restraining order, temporary and permanent injunction, compensatory and punitive damages, and attorney fees. On this same day the district court conducted a hearing on the request for a TRO. On January 23 it entered a written order denying the request. Two days later, January 25, the court entered a final judgment dismissing the case on the merits.

## I. The City

■ The Movement contends that the section of the City's parade ordinance that bans parades and assemblies on Saturday mornings on streets adjacent to, or leading to, the county courthouse, violates the First Amendment on its face and as applied. Indisputably the proposed parade involves First Amendment activity. Also beyond dispute is the fact that this ordinance regulates such activity within a traditional public forum, indeed, "the archetype of a traditional public forum," public streets. *Frisby v. Schultz*, 487 U.S. 474, 480–81, 108 S.Ct. 2495, 2499–2500, 101 L.Ed.2d 420

(1988). *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (Roberts, J., joined by Hughes, C.J., and Black, J.). Our method of determining the constitutionality of the ordinance depends initially on whether it regulates expressive activity on the basis of content. If the restriction is based on the content of the expression, then the ordinance must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45, 103 S.Ct. at 954. If the ordinance is content-neutral, then it must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

The district court determined that § 6(g) of the parade ordinance was content-neutral. Although this section was enacted in the wake of previous demonstrations by the plaintiff and its affiliated organizations in Cumming, the ordinance on its face clearly does not discriminate among paraders on the content of their proposed expressive activities. The Movement nonetheless contends that the City's refusal to allow it to hold its activities in the morning was motivated by disagreement with the Movement's message. This contention is refuted by the simple fact that the City granted the Movement's earlier request to conduct a parade in the afternoon. The district court's determination is correct.

Thus the City's burden is to establish that its ordinance furthers significant municipal interests, that its restrictions are narrowly tailored to achieve those interests, and that those wishing to engage in expressive activity in Cumming have ample alternative means of doing so. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984) (once plaintiff demonstrates that First Amendment applies, the government bears burden of justifying impingements on protected activity); *id.*, at 309, 104 S.Ct. at 3077 (Marshall, J., joined by Brennan, J., dissenting) ("The First Amendment requires the Government

to justify *every* instance of abridgement.") (emphasis in original). Unfortunately, because of the manner in which the hearing on the TRO request developed, the City did not have an opportunity to offer evidence to sustain this burden. After the plaintiff rested, a dialogue followed between court and counsel for all parties. Before permitting the City to present evidence, the court stated from the bench that the City "for some reason" had made a determination that Saturday morning parades were undesirable, that this ban was applied evenhandedly, and that the Movement had alternative means of conducting a parade since Saturday afternoon was available. The court then dismissed the suit against the City. Rec. III, p. 127. The County and the Board of Education then put on evidence, but the City did not in light of the court's oral ruling.[2]

■ We cannot affirm the judgment in favor of the City on the basis of the record before us. Although the City identified some of the governmental interests to be served by the ordinance in its preamble, which we set out in the margin, the record contains no evidence showing how those interests were advanced by a Saturday morning ban on parades and rallies.[3] The

2. In its subsequent written order the district court held that the ordinance was not an absolute prohibition on speech but merely regulated the time and manner of the activity, that it was content-neutral, and that there was no evidence it was not applied evenhandedly to all groups. Accordingly, the court found that the ordinance was reasonable, served significant government interests, and did not unduly burden the First Amendment rights of the Movement or its members.

3. The recitals of findings and purposes contained in an ordinance's preamble can serve to identify governmental interests for the purposes of this analysis. *See Frisby v. Schultz,* 487 U.S. 474, 477, 484, 108 S.Ct. 2495, 2498, 2502, 101 L.Ed.2d 420 (1988). Indeed, such recitals may well be entitled to greater weight in identification of governmental interests than post hoc articulations by counsel in judicial proceedings. The City of Cumming set out the following findings in the preamble of its Parade Ordinance.

WHEREAS the General Assembly of the State of Georgia has delegated the police powers of the State of Georgia to the City of Cumming, Georgia, with respect to persons and property situated within the municipal limits of the City of Cumming, Georgia, and expressly authorized and empowered said Mayor and Council of the City of Cumming, Georgia, to make such rules and regulations with respect to persons or property and all other things affecting the good government of the City as it shall deem requisite and proper for the security, welfare, health, safety, and convenience of the City and for the preservation of the peace and good order of same; and

WHEREAS private organizations and groups of private persons have from time to time sought to use public property and public roads within the jurisdiction of the City of Cumming, Georgia, for private purposes; and

WHEREAS such uses have included parades, assemblies, demonstrations, road closings, and other related activities; and

WHEREAS it is in the public interest that such uses not interfere unduly with the rights of citizens not participating therein nor endanger the public safety nor obstruct the orderly flow of traffic; and

WHEREAS it is right and proper for the security, welfare, health, and convenience of the citizens of the City of Cumming, Georgia, and for the preservation of the peace and good order of said City that rules and regulations relating to parades, assemblies, demonstrations, road closings, and other related activities within the city limits of the City of Cumming, Georgia, be established and that violations of said rules and regulations be punishable in the police court of Cumming as provided by laws; and

WHEREAS the City of Cumming's Administrator shall be empowered to designate reasonable sites and set reasonable time schedules for the beginning and end of parades, assemblies, demonstrations, road closings, and other related activities where more than one is applied for or where the proposed activity interferes with the public safety or obstructs the orderly flow of traffic; and

WHEREAS the City Administrator should be empowered to cancel the permit for any parade, assembly, demonstration, road closing, or other related activity where the participants fail to appear and begin within any reasonable time of the scheduled time based on other activities permitted or based on the unreasonable interference with the public welfare, peace, safety, health, good order, and convenience to the general public; and

WHEREAS the City Administrator should be empowered to coordinate all of his duties and decisions under this Ordinance with the official designated by the County of Forsyth charged with the same duties and decisions as to parades, assemblies, demonstrations, road closings, and other related activities; and

WHEREAS the Board of Commissioners of Forsyth County, Georgia, has amended its Ordinance to restrict interference with the ad-

City must demonstrate the logical and practical relationship between the restriction and these interests, so that the court may determine whether the restriction is substantially broader than is necessary to achieve those ends. *See Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989); *Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1391–92 (D.C.Cir. 1990). Requiring any lesser showing would render the "narrow tailoring" factor of the analysis nugatory.

Although the City has not carried its burden of justifying the challenged provision of its ordinance, it has not had a meaningful opportunity to do so. Therefore, we vacate the judgment as to the City and remand for further proceedings on the Movement's complaint against it. The Movement also challenged that aspect of the City's permit limiting the parade to one lane of the two-lane street that leads from the high school to the courthouse. This claim must also be remanded to the district

court for further proceedings for the same reasons.[4]

## II. Forsyth County

■ The Movement attacked as facially unconstitutional the County ordinance providing for a permit fee of up to $1,000 per day for each day that a parade or rally takes place.[5]

> The crucial concern here is the extent of the right of the public to use the city streets and parks, which the Supreme Court has regarded as quintessential public forums, to exercise First Amendment activity, without the imposition of pecuniary burdens which allegedly go beyond a municipality's concern of legitimate interests.

*Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515, 1521 (11th Cir.1985), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986). In *Central Florida* we considered the constitutionality of an Orlando, Florida ordinance that authorized the Chief of Police to charge persons exercising First Amend-

ministration of justice on the Forsyth County Courthouse grounds and to minimize the likelihood of interference with the rights of non-participating citizens residing in close proximity to the Forsyth County Courthouse; and
WHEREAS the Mayor and Council of the City of Cumming, Georgia, wish to maintain the free flow of traffic on the roadways around and leading to the Forsyth County Courthouse grounds; and
WHEREAS the Board of Commissioners of Forsyth County, Georgia, have recently amended the County's Ordinance regarding this subject matter, making it advisable and necessary for the Mayor and Council to amend the City's Ordinance to maintain consistency within these respective jurisdictions;
. . .

4. The City informed the Movement by letter that it had granted the permit. After the statement that the parade is to commence at the high school, the letter contains this parenthetical sentence: "(You must obtain permission from school authorities to use their property for parking and assembling.)" We do not construe this sentence as a provision conditioning the City's permit on Board of Education approval. Rather it appears to be merely a cautionary notice that the City permit does not cover parking or assembling on school property and that permission for those purposes must be obtained from school authorities. Even if this sentence is a formal condition on the City's permit, it

amounts to no more than a reasonable decision to hold the Movement to the terms of its application. *See* discussion in section III. of text, *infra.*

5. Sections 6 and 7 of the Amended County Ordinance, No. 34, provide:

> (6) Every private organization or group of private persons required to procure a permit under the provisions of this Ordinance shall pay in advance for such permit, for the use of the County, a sum not more than $1,000.00 for each day such parade, procession, or open air public meeting shall take place. The Administrator shall adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed. In no event shall the Administrator calculate the amount of the permit fee by considering said fee as a revenue tax.
> (7) If the private organization be other than individuals, a permit will not issue without the paying of the necessary fee; individuals may be excused from such a deposit on account of indigence upon the execution under oath, by each individual in the group applying for the permit, of a pauper's affidavit. Prior to the receipt of such an affidavit the Administrator shall advise the applicant orally or in writing of the penalties for the execution of a false document.

ment rights the full cost of additional police protection, as a condition to the granting of a permit. We held:

> Although license fees are proper for the costs of administering an event, under the Supreme Court's decision in *Cox v. New Hampshire* [312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)], we read *Cox* as authorizing only nominal charges for the use of city streets and parks to further First Amendment activities. An ordinance which charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment. We, therefore, hold that the Orlando City Ordinance 18A.12 which requires persons wishing to use city streets and parks to demonstrate, to prepay an amount of costs for additional police protection determined by the discretion of the chief of police is unconstitutional.

*Id.* at 1523.[6] In the present case the district court recognized that the Forsyth County Administrator, like the Orlando Chief of Police, had great discretion in determining an appropriate fee and held that, under the evidence, the Administrator exercised that discretion by charging for the costs of investigating and processing the application. There was no element of charge for the potential cost of additional police protection or for maintaining public order, and the determination of the fee was based solely upon content-neutral criteria.[7] These distinctions addressed the methodology described in *Central Florida* for determining a fee. But the First Amendment imposes limitations on the *size of a fee* apart from the permissible components of it. To repeat, "we read *Cox* as authorizing only nominal charges for the use of city streets and parks to further First Amendment activities. An ordinance which charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment." 774 F.2d at 1523.[8] It is not necessary that we stake out the outer limits of a "nominal" charge.[9] It is enough to hold, as we do, that the Forsyth County provision for a permit fee of up to $1,000 for each day that a parade or rally takes place exceeds the constitutional requirement that such a charge be at most nominal.[10]

## III. The Board of Education

The Board of Education granted the Movement permission to assemble on the

---

6. Our interpretation of *Cox* was aided substantially by the later case of *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), as well as by more recent Supreme Court cases involving traditional public forums. *Central Florida*, 774 F.2d at 1522. Concurring on other grounds, Judge Henderson disagreed with the majority's reading of *Cox*. *Id.* at 1527–28 (Henderson, J., concurring); *see also Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1081 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 271 (1990). We have reviewed Supreme Court cases involving public forums decided since *Central Florida*, and find no basis on which to reevaluate its ruling. *See, e.g., Smith v. Duff and Phelps, Inc.*, 891 F.2d 1567, 1570 (11th Cir.1990) (previous decision of this circuit is binding on subsequent panel, unless overruled by the circuit court sitting en banc, or called into question by change in Supreme Court precedent).

7. The court expressed doubt about the constitutionality of the portion of the ordinance that permits fees to be based upon the costs incident to maintaining public order but considered that issue not squarely before it.

8. Given our conclusion that the ordinance is facially unconstitutional, we need not address the Movement's arguments concerning the section of the ordinance that exempts certain persons from payment of fees on the basis of their ability to pay. *See Central Florida*, 774 F.2d at 1523–24. At the January 19 hearing counsel for the County attempted to explain the operation of the exemption provision. Despite the attempt, this provision appears to be virtually incomprehensible, at least in its application to corporate applicants like the Movement.

9. *Central Florida* concerned costs that would arise from furnishing police protection for an event to occur on a non-workday by using off-duty officers who would be paid time and a half. The Movement contends that assessing a fee for administering a speech event cannot be based, as it was here, upon usual duties performed by regular employees during regular duty hours. We need not decide this issue.

10. The Movement also challenged the County's imposition of a $100 permit fee on it as an unconstitutional application. Because we hold that the ordinance is facially unconstitutional we do not need to inquire whether the particular imposition of a fee of $100 is unconstitutional.

high school grounds without limitation as to morning or afternoon and without imposition of a permit fee. Nevertheless the Movement contends that its First Amendment rights were violated because the Board conditioned the permit on approval by the City and County of the Movement's parade and rally applications. In its formal application the Movement requested permission only to use the school parking lot as a base from which to assemble, to immediately depart while conducting its other activities, and to return three hours later and disassemble. The participants in the event would thus be on school grounds only a short time prior to the parade and another short time after it. It was also evident in the permit application that the parade and rally would take place well off school grounds. These circumstances were clearly important factors for the Board to consider, since another event, a junior high school basketball tournament, was scheduled to take place on school facilities during the morning and afternoon of the same day as the rally. Thus, the Board's stated "conditions" are no more than restatements of the premises of the plaintiff's application to it. In granting the permit, the Board gave the Movement precisely the authority requested. The Movement's argument that in doing so the Board somehow violated the First Amendment is both ironic and meritless.

■ Shortly before the date of the King holiday, after arrangements with the City had failed, the Movement requested approval in discussions with the Board's legal counsel to conduct its rally and speeches in the school parking lot. The Board denied this request on the ground that such a rally would disrupt the previously scheduled basketball tournament.[11] The Movement conceded at the TRO hearing that the school parking lot was not a traditional public forum. The district court noted that the record contained no evidence that the Board of Education had expressly designat-

ed this parking lot as an area for speech activity. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 954; *see also United States v. Kokinda*, — U.S. ——, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990) (plurality opinion) (government does not dedicate an area as a public forum by permitting limited discourse there but only by intentionally opening it for general public discourse) (citing *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985)). Thus, the Board "may reserve the [parking lot] for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. The record demonstrates amply that the Board denied the Movement's request on the basis of its judgment that the plaintiff's assembly was incompatible with the other events taking place at the school that day, not out of disagreement with the Movement's viewpoint. The Board's action was reasonable and did not violate the First Amendment rights of the plaintiff.

### IV. Evidentiary rulings

■ In an effort to introduce purported business records of the Movement, its attorney Richard Barrett (who is also its chief executive officer), "appointed" an available member of the organization, Dennis Wheeler, as "acting secretary" on the morning of January 19 and called him at the hearing later that day as a witness to authenticate the records. The witness had no knowledge of the records, could not identify them, and had never seen them until presented them by the attorney that morning. The district court granted defendants' motions to strike the testimony of this witness; therefore, Wheeler was unable to authenticate the records. The court did not err in this ruling. *See* Fed.R.Evid. 602.[12]

11. The record is unclear on the issue of whether the Board of Education actually considered the Movement's request to conduct a rally in the parking lot. We assume for purposes of analy-

sis of this issue that the Board denied the request.

12. The plaintiff argues at length on appeal that the district court erred in refusing to introduce

] The court did not err in taking judicial notice that it had "observed that plaintiff's rallies and marches are often loud and attract boisterous and sometimes violent counter-demonstrators," and that "the potential for noise and violence is great." There had been two previous marches in recent years in Cumming by the Movement, or by what it called its "local affiliate," which it described as operating within the Movement's "corporate umbrella or corporate protection." The marches and counter-marches in the county had been the subject of national publicity and attention and had implicated sharp racial tensions. At least two federal cases involving these prior events had occurred in the same judicial district as the present case, each with considerable fanfare. The district judge's observations were apparently based on local and national media accounts, as well as on public records. Moreover, these facts were generally known within the Cumming and Atlanta areas. Thus, they were proper subjects of judicial notice. *See* Fed.R.Evid. 201(b); *Gilmore v. City of Montgomery,* 417 U.S. 556, 567, 94 S.Ct. 2416, 2423, 41 L.Ed.2d 304 (1974); *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1304 (11th Cir.1988); *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1278 n. 33 (5th Cir.1978); *see also Holland v. Wilson,* 737 F.Supp. 82, 84 (M.D.Ala. 1989) (noting violence attending those prior rallies). In any event, the Movement did not request a hearing before the district court on this issue pursuant to Fed.R.Evid. 201(e). *See Norman,* 836 F.2d at 1304 (failure to move for hearing renders issue non-appealable).

## V. Rulings Relating to *Pro Hac Vice* Status

At the hearing held on January 19, the district court allowed Barrett to appear in the case *pro hac vice* for the Movement. As the hearing proceeded, however, the district judge made known his ethical concerns about several actions by Barrett, including: presenting Wheeler as a witness to authenticate corporate documents, which the court described as an attempt to create a fraud on the court; making frivolous objections based on an alleged attorney-client privilege to prevent the truth from emerging about Wheeler's lack of qualifications to testify; concealing from the court his personal interest in the litigation as the proposed Movement speaker in Forsyth County; and asking an adverse witness whether he was a veteran, in an effort to embarrass and disparage him.[13] The judge made clear that these matters raised serious issues about Barrett's compliance with professional ethical standards and stated that he was considering the possibility of sanctions under Fed.R.Civ.P. 11. He announced from the bench:

> I'm going to permit you to conclude this case. You've started it; I'm going to permit you to conclude it. I may or may not ultimately rule upon it based upon the issue that has been raised, but we're in the middle of it. I'm going to have it concluded. The matter's not over. So, if you've got any other evidence to present, present it. Let's get on with it.

Rec. III, p. 94.

 In its written order of January 23 denying a TRO the court addressed at length Barrett's conduct and concluded

---

into evidence correspondence and other documents proffered while this witness was on the stand. The argument has no merit. The district court later construed most, if not all, of these documents, as part of the record after counsel for the defendants stipulated to their authenticity. *See* Rec. III, pp. 98–102.

**13.** On the issue of Barrett's interest in the litigation, the Movement contends that the district judge violated Fed.R.Evid. 201 by taking judicial notice of Barrett's activity in the prior demonstrations in Cumming. During the TRO hearing, the judge stated, "It is clear to the court at

this time ... that you're more than an attorney in this case; you are an active participant and party. I became convinced of that when I saw the news broadcast and saw you standing on the back of a pickup truck with a bullhorn whipping up the crowds in Forsyth County in the parade ..." Rec. III, p. 93. We need not determine whether this observation falls within the category of facts of which a court may take judicial notice under Rule 201(b)(2), since the Movement did not move for a hearing on it under Rule 201(e). *See Norman,* 836 F.2d at 1304.

that Barrett "is hereby on notice that the court will not grant any future applications to appear *pro hac vice* due to the misconduct which occurred during the hearing in this action." The Movement filed a motion to reconsider this ruling, in which Barrett requested a hearing and an opportunity to respond. On April 25 the court denied this request for a hearing on the grounds that it had informed Barrett of its concerns at the January 19 hearing, and that Barrett had an opportunity to respond to them then. Its order said:

> During the hearing, the court warned counsel that it considered counsel's actions to be improper and that the court would consider Rule 11 sanctions and would probably not allow counsel to appear *pro hac vice* again. 82–84, 94. However, for expediency, counsel was allowed to complete the hearing....
>
> ... Nevertheless, the court will reconsider its ruling to the extent that the denial of *pro hac vice* applies prospectively. The court hereby amends its previous ruling as follows:
>
> Counsel for plaintiff's authority to appear *pro hac vice* is hereby revoked for purposes of this case only. In future cases before this court, counsel may apply for leave to appear *pro hac vice* and the court will consider such applications on a case by case basis.
>
> Accordingly, the motion for reconsideration is granted to the extent that the court has modified its order as set forth immediately above. The motion is denied in all other respects.

Rec. II, Document 20, pp. 8–9 (footnote omitted).

We are unsure what the court intended by these rulings on Barrett's *pro hac vice* status. We believe the matter can be best laid to rest on remand by the district court's clarifying its intentions and by our stating at this time the governing principles that then would be applicable.[14]

If the court intended that Barrett would be permitted to "conclude this case," then Barrett has suffered no deprivation. He can finish the present case but, as set out in the April 25 order quoted above, in any future case he must apply for *pro hac vice* status. This is what he would be required to do anyhow. *Pro hac vice* status is for a case, or for a described matter within a case, and is not a continuing authorization.

On the other hand, if on remand the district court clarifies its orders by stating that it intended to revoke, and has revoked, Barrett's authority to appear in this case beyond the TRO hearing, we hold that Barrett's objections to revocation by the district court are not well taken. The preliminary legal issue presented is whether the district court satisfied procedural constraints on its authority to revoke *pro hac vice* status. In *Kirkland v. National Mortgage Network, Inc.*, 884 F.2d 1367 (11th Cir.1989), the Eleventh Circuit declared that when a court admits an attorney *pro hac vice*, it may not later revoke this status without notice of the charges against him and an opportunity to explain. *Id.* at 1371–72 (citing *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1211 (11th Cir.1985)). Barrett contends that the district court did not provide him these notice and hearing rights. We disagree. A separate hearing on this issue is not necessary in every case. *Johnson v. Trueblood*, 629 F.2d 302, 304 (3d Cir.1980), cited in *Kirkland*, 884 F.2d at 1372 n. 12. In this case the district court put Barrett on clear notice of its concerns during the course of the January 19 hearing and allowed him an opportunity to explain his actions there.[15] Moreover, since the conduct forming the factual basis of the court's ruling occurred in court before the district judge, a separate hearing was not necessary for factfinding purposes.

---

14. We address these issues in the interest of efficiency and expedition. We do not, by addressing them, imply or even hint at what the district court's position should be on remand.

15. These facts readily distinguish this case from the situations in *Kleiner* and *Kirkland*, where the disqualified attorneys were given no notice of the factual concerns of the court before disqualification. See *Kirkland*, 884 F.2d at 1369, 1372 n. 13; *Kleiner*, 751 F.2d at 1199, 1210–11.

The district judge's findings of fact on the revocation issue are reviewed on a clearly erroneous standard. *Norton v. Tallahassee Memorial Hospital,* 700 F.2d 617, 619 (11th Cir.1983). We give great regard to the district court's findings supporting its decision in this case, including those bearing on Barrett's motivations and state of mind, since those findings are based on the judge's "observation of witnesses, [and] his superior opportunity to get 'the feel of the case.'" *Id.* (quoting *Noonan v. Cunard Steamship Co.,* 375 F.2d 69, 71 (2d Cir.1967) (Friendly, J.)). In particular, the evidence fully supports the finding that Barrett's examination of witness Wheeler as an "acting secretary" of the Movement was an effort to commit a fraud on the court. Even the cold record demonstrates that Barrett attempted to establish a false appearance of Wheeler's competency to testify and to sponsor documents by giving him a manufactured title, when in reality Wheeler bore neither knowledge of nor responsibility over the subject matter. As this pretense unraveled under cross-examination, Barrett attempted to prevent discovery of the ruse through meritless objections, and later through leading questions on redirect examination.

Finally, we identify the appropriate standard by which to review a conclusion by the district court that revocation is warranted. "Cases applying the standards of the Code of Professional Responsibility to questions of attorney disqualification warrant full appellate review to ensure that there is consistency of treatment." *Norton,* 700 F.2d at 620. Similarly, where disqualification raises other substantial concerns such as a criminal defendant's rights under the Sixth Amendment, the district court's decision is subject to careful examination by the appellate court. *Id.* On the other hand, this case presents unique facts involving the integrity of the court system and respect for its participants within a courtroom proceeding. Under these circumstances, the district court must be accorded some discretion in monitoring its own processes. *Id.* at 619–20; *United States v. Dinitz,* 538 F.2d 1214, 1219 (5th Cir.1976) (en banc), *cert. denied,*

429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977). With these principles in mind, we believe that if the district court ruled that Barrett's conduct at the January 19 hearing justified revocation of his *pro hac vice* status, this ruling fell within the ambit of its appropriate discretion.

### VI. Attorney Fees

The trial court granted the motions of the Board of Education and the City for attorney fees under 42 U.S.C. § 1988, and awarded $4,700 to the City and $1,840 to the Board, on the ground that the suit was frivolous, unreasonable and without foundation. *See, e.g., O'Neal v. DeKalb County,* 850 F.2d 653, 658 (11th Cir.1988). The conclusions that we have reached on the merits of the appeal require that the award of attorney fees in favor of the City be reversed. Although we have affirmed the district court on the merits with respect to the Board of Education, the factual and legal issues relating to the Movement's alternative request to use the school parking lot as the site for its rally and speeches, the Board's prior commitment for use of school premises for a basketball tournament, and the conflict between these events, were not frivolous matters for decision. Thus the award of attorney fees to the Board of Education must also be reversed. *Accord Acorn v. City of Phoenix,* 798 F.2d 1260, 1273 n. 15 (9th Cir.1986).

### VII. Summary

Summarizing, the judgment dismissing the claims against the City is VACATED and these claims are REMANDED for further proceedings in which the City is entitled, if it wishes, to an opportunity to justify the challenged provisions of its ordinance. The judgment dismissing the claims against Forsyth County is REVERSED and judgment shall be entered holding unconstitutional the provision of the County's ordinance providing for a fee of up to $1,000 per day. The judgment dismissing the claims against the Board of Education is AFFIRMED. The rulings of the district court with respect to Barrett's *pro hac vice* status are REMANDED to

the district court for further proceedings as described in this opinion. The judgment awarding attorney fees to the City and to the Board of Education is REVERSED.

FAY, Circuit Judge, concurring specially:

I concur in Judge Godbold's scholarly and thoughtful opinion but add one thought because of my concern that the law of our circuit has strayed from the precedents announced by the Supreme Court. Judge Henderson's separate concurrence in the *Central Florida* case, 774 F.2d at 1526, points out the error of reading *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), and *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), as prohibiting the assessment of fees based upon the cost of ensuring public safety and keeping the peace. As Judge Godbold points out, the *Central Florida* opinion is binding upon all of us until modified or overruled by our court sitting en banc. In my opinion, it may be time to do just that.

It simply makes no sense whatsoever to impose upon the public fisc all costs associated with policing rallies, parades or other functions planned by any number of organizations. As Judge Henderson pointed out, "[t]he ꞏ 'First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.'" *Central Florida*, 774 F.2d at 1529 (Henderson, J., concurring) (quoting *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981)). First amendment rights are not unlimited. Although these rights are precious, I fear we may have jumped too far too fast. A $1,000 fee for the costs associated with processing the application and policing a parade and rally designed to use the city's main street and the county courthouse square for a period of one and a half to two hours strikes me as being extremely nominal.

As the Ninth Circuit recently stated:

Kaplan argues that *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) as interpreted by *Murdock v. Pennsylvania*, 319 U.S. 105, 116, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943) allows only a nominal fee to gain access to a limited public forum. *Cox* approved a city-imposed fee of $300 for the use of public streets for a parade by the Jehovah's Witnesses that was a reasonable estimate of the costs of policing the function. The *Murdock* case involved a license fee for home solicitation, unrelated to costs, that the Jehovah's Witnesses contended was a restriction on First Amendment rights. The Court distinguished the license fee from the requirement of a parade permit in *Cox*, noting that "the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." This is not a statement that *only* nominal charges to defray expenses are constitutionally permissible, but rather noting the particular distinction between the facts in *Cox* and those in *Murdock*. We find nothing in *Cox* that requires that all charges for any public forum be limited to "nominal" charges. For example, certainly reasonable rental charges can be made as a condition for granting the use of a municipal auditorium to any group on a nondiscriminatory basis.

. . . .

In this circuit, we have recognized that it does not violate the First Amendment for a public entity to collect charges that fairly reflect costs incurred by the municipality in connection with an activity involving expression. *Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir.1976), *cert. denied sub nom. Leipzig v. Baldwin*, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

*Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1081 (9th Cir.1990) (emphasis in original).

It seems to me that the position taken by the Ninth Circuit is both sound and in accord with Supreme Court pronouncements.