John F. DAWSON, Petitioner–Appellant,

v.

Roger SCOTT, Warden, Respondent–
Appellee.

No. 93–6240.

United States Court of Appeals,
Eleventh Circuit.

April 6, 1995.

John F. Dawson, Birmingham, AL, Jeff P. Manciagli (Court-appointed), Atlanta, GA, for appellant.

Jack W. Selden, U.S. Atty., Winfield J. Sinclair, Asst. U.S. Atty., Birmingham, AL, Joseph Douglas Wilson, U.S. Dept. of Justice, Criminal Div., Washington, DC, for appellee.

Before ANDERSON and BIRCH, Circuit Judges, and CONWAY *, District Judge.

BIRCH, Circuit Judge:

This habeas case presents the first-impression issue for our circuit of whether sentence credit is applicable for time spent in a halfway or safe house as a condition of release on bond before adjudication of guilt or sentencing, or after sentencing prior to surrender to the custody of the Attorney General. The district court determined that denial of sentence credit for this time was the proper statutory and constitutional interpretation. We AFFIRM.

## I. BACKGROUND

On May 1, 1990, petitioner-appellant John F. Dawson was arrested by New Mexico federal agents for cocaine distribution. When Dawson was arrested, the government filed a forfeiture action against his residence and seized it. Following a detention hearing on May 3, 1990, Dawson was released on a personal recognizance bond. That same day, however, the bond was revoked upon a finding that Dawson was ineligible for bond because he had no home to which he could be released. Dawson was returned to custody. On May 4, 1990, Dawson was released on bond with the condition that he be placed in La Posada Halfway House in Albuquerque, New Mexico.

Dawson resided at this halfway house for 104 days. During his time there, it is undisputed that he was subjected to the same conditions as other residents, including convicts serving their sentences there. While these conditions, such as random urinanalysis samples, searches of person and property, and no alcohol, sexual activity, or entry into other resident rooms, were mandatory, residents were confined to the premises of the halfway house from 7:00 P.M. until 7:00 A.M. only. During the daytime, they were either working in outside employment or seeking employment.

Dawson pled guilty to one count of violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) on August 15, 1990. Because of safety concerns resulting from Dawson's agreement to cooperate with the government, the court amended Dawson's presentence condition of release and transferred him from the halfway house to a "safe house."[1] Dawson remained in the

---

* Honorable Anne C. Conway, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. Dawson's New Mexico counsel avers that, during plea negotiations, he and the Assistant United States Attorney determined that Dawson's cooperation with the government could threaten his safety and that "continued residence in the halfway house was unwise because of these safety concerns." R1–13–E23 (Petitioner's Opposition to Respondent's Motion for Summary Judgment and Cross–Motion for Partial Summary Judgment, Affidavit of Charles H. Reid, Esq.). Thus, Dawson was transferred from the halfway house to a safe house at "an undisclosed location,"

where his counsel understood that Dawson "would still be subject to all of the conditions" imposed upon him at the halfway house. *Id.* In his request for administrative relief with the Bureau of Prisons, Dawson explains that "[a]fter my plea agreement I was transferred to a protective custody 'safe-house' due to the publicity of the case and for a perceived danger to my safety held by both the government and my defense counsel. The conditions of my restrictions were continued by the court at the 'safe-house'." R1–12–A1 (Petitioner's Affidavit in Opposition to Respondent's Motion for Summary Judgment, Request for Administrative Remedy).

safe house for 384 days, including time after he was sentenced and prior to his required surrender to the custody of the Attorney General.

On December 11, 1990, Dawson was sentenced to forty-one months in the custody of the Attorney General and three years of supervised release. Initially, Dawson was to surrender voluntarily on January 15, 1991. His surrender date subsequently was extended until September 4, 1991, to permit Dawson to continue assisting the government. Consequently, the government recommended a downward departure in Dawson's sentence. Dawson did not file a direct appeal. In September, 1991, Dawson began to serve his term of incarceration, and the district court reduced his sentence to twenty-four months. Although he initially surrendered to the Bureau of Prisons ("BOP") at the Federal Prison Camp ("FPC"), El Paso, Texas, the BOP transferred Dawson to FPC, Talladega, Alabama.

The BOP credited Dawson for the days that he was imprisoned prior to his release to the halfway house before his plea. After exhausting his BOP administrative remedies, Dawson filed a pro se habeas corpus petition pursuant to 28 U.S.C. § 2241 in the Northern District of Alabama on May 20, 1992. He sought credit against his sentence for the time that he spent in halfway and safe houses, totaling 488 days. Dawson argued that this time constituted "official detention", within the meaning of 18 U.S.C. § 3585(b), that should be credited against his sentence.

■ A magistrate judge recommended that his petition be denied, and the district court adopted that recommendation. This appeal ensued. Dawson has completed his term of incarceration; he currently resides in Birmingham, Alabama, and is serving his period of supervised release.[2]

## II.  DISCUSSION

### A.  *Statutory Interpretation*

■ "The judiciary is the final authority on issues of statutory construction," *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984); "[w]e review a district court's interpretation and application of a statute de novo," *F.D.I.C. v. S & I 85–1, Ltd.,* 22 F.3d 1070, 1071 (11th Cir.1994). *See James v. United States,* 19 F.3d 1, 2 (11th Cir.1994) (per curiam) (holding that whether a statute affects sentencing is a "question of law subject to *de novo* review"). To interpret a statute administered by an agency, the *Chevron* court established "a two-step process." *Jaramillo v. I.N.S.,* 1 F.3d 1149, 1152 (11th Cir.1993) (en banc). First, if congressional purpose is clear, then interpreting courts and administrative agencies "must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781.

A second level of review, however, is triggered when "the statute is silent or ambiguous with respect to the specific issue." *Id.* at 843, 104 S.Ct. at 2782. Where an administrating agency has interpreted the statute, a reviewing court is bound by the *Chevron*

---

While the dissent would segregate the safe house time and remand for the district court to determine the conditions of confinement there, it is clear that Dawson makes no distinction in the residence conditions, making it appropriate to cumulate the halfway and safe house residences for our analysis of this appeal. Indeed, the safe house residence merely continued for safety reasons the conditions of release imposed upon Dawson by the court and to which he agreed in his plea agreement. This included twelve hours a day away from the safe house. Unlike the dissent, we find the conditions of *release,* whether at a halfway or safe house, not to be dispositive of this appeal.

**2.**  Because Dawson was released from federal custody on May 28, 1993, the government moved

to dismiss this appeal as moot. The government argues that, even if Dawson were to obtain relief under 18 U.S.C. § 3585(b), it would be ineffective since Dawson has completed his incarceration term. Thus, the government contends that this appeal is moot. We disagree. Dawson is still serving his term of supervised release, which is part of his sentence and involves some restrictions upon his liberty. Because success for Dawson could alter the supervised release portion of his sentence, his appeal is not moot. *See Jago v. Van Curen,* 454 U.S. 14, 21 n. 3, 102 S.Ct. 31, 36 n. 3, 70 L.Ed.2d 13 (1981) (per curiam); *United States v. Eske,* 925 F.2d 205, 206 n. 2 (7th Cir. 1991). The government's motion to dismiss this appeal is denied.

"rule of deference." *Jaramillo*, 1 F.3d at 1152. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation" by an administrating agency. *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. Agency interpretation is reasonable and controlling unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.; Alabama Power Co. v. Federal Energy Regulatory Comm'n*, 22 F.3d 270, 272 (11th Cir.1994). Thus, "we defer to an agency's reasonable interpretation of a statute it is charged with administering." *Bigby v. United States I.N.S.*, 21 F.3d 1059, 1063 (11th Cir.1994). This direction governs our analysis of this case.

■ Dawson argues that the 488 cumulative days that he spent in a halfway house and a safe house were "official detention" under 18 U.S.C. § 3585(b), and that this time should be credited against his subsequent sentence. Section 3585(b) provides:

> Credit for prior custody. A defendant *shall be given credit* toward the service of a term of imprisonment for any time he has spent in *official detention* prior to the date the sentence commences—

> (1) as a result of the offense for which the sentence was imposed; or
> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

> that has not been credited against another sentence.

18 U.S.C. § 3585(b) (emphasis added). Thus, we must determine the statutory meaning of "official detention" in section 3585(b) to decide whether Dawson is entitled to sentence credit for the time that he spent in halfway and safe houses.

The predecessor statute to section 3585(b) provided that "[t]he Attorney General shall give any ... person credit toward service of his sentence for any days spent *in custody* in connection with the offense or acts for which sentence was imposed." 18 U.S.C. § 3568 [3] (emphasis added). Although the language differs in section 3568 and present section 3585(b), the majority of circuits that have considered the issue have determined that "the term 'custody' under § 3568 has the same meaning as the phrase 'official detention' under § 3585." [4] *Moreland v. United States*, 968 F.2d 655, 658 n. 6 (8th Cir.) (en banc) (plurality opinion),[5] *cert. denied*, ——

---

3. Section 3568 has been repealed. For individuals who committed crimes on or after November 1, 1987, such as Dawson, 18 U.S.C. § 3585(b) governs.

4. The Tenth Circuit has recognized that there is "nothing in the language of 18 U.S.C. § 3585 itself or its legislative history to indicate a departure from the precedents decided under the predecessor statute." *United States v. Woods*, 888 F.2d 653, 655 (8th Cir.1989) (citing S.Rep. No. 225, 98th Cong., 2d Sess. 128–29, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3311–12), *cert. denied*, 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990). We are cognizant that the Supreme Court has indicated that Congress intended a change when it "entirely rewrote § 3568" in § 3585(b), and further suggested in *dicta* that the change in terminology from "custody" to "official detention" was significant. *United States v. Wilson*, 503 U.S. 329, 337, 112 S.Ct. 1351, 1355, 117 L.Ed.2d 593 (1992). Having reviewed the revised statute, we agree with the Ninth Circuit that the actual purpose in altering § 3568 was "to make 'clear that a defendant could not receive a double credit for his detention time,' and to 'enlarge[] the class of defendants eligible to receive credit.'" *Mills v. Taylor*, 967 F.2d 1397, 1400 (9th Cir.1992) (quoting *Wilson*, 503 U.S. at 337, 112 S.Ct. at 1356); see *Koray v. Sizer*, 21 F.3d 558, 563 & n. 2 (3d Cir.1994) (reviewing in

detail the legislative history and concluding that the change from "custody" to "official detention" was not intended to alter the meaning of the statute), *cert. granted*, —— U.S. ——, 115 S.Ct. 787, 130 L.Ed.2d 779 (1995).

5. Interestingly, the dissent bases its determination that "official detention" is unambiguous on the dissent to the Eighth Circuit's en banc opinion in *Moreland*, with its dictionary definition of "official." Dissent at 896 (citing *Moreland*, 968 F.2d at 664 (Heaney, J., dissenting)). Although the dissent does not reference the *Chevron* statutory interpretation analysis, it apparently believes that, under the first test, presentence residence in a halfway house unambiguously qualifies as official detention, and that sentence credit is applicable. As evidenced above, other circuits have not found the wording change from former § 3568 to present § 3585(b) obvious, plain or ordinary. They have grappled with the legislative history involved in changing "custody" in former § 3568 to "official detention" in § 3585(b) and determined that no difference in meaning was intended.

Even the *Moreland* dissent, upon which the dissent in this case relies, recognizes that "[a]lthough the legislative history states that Congress did not intend a different result by this change in language, the new language is at least more precise than the old." *Moreland*, 968 F.2d at

U.S. ——, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992); *accord Koray v. Sizer,* 21 F.3d 558, 563 (3d Cir.1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 787, 130 L.Ed.2d 779 (1995); *Mills v. Taylor,* 967 F.2d 1397, 1400 (9th Cir.1992); *United States v. Edwards,* 960 F.2d 278, 283 (2d Cir.1992); *Pinedo v. United States,* 955 F.2d 12, 13–14 (5th Cir.1992) (per curiam); *United States v. Becak,* 954 F.2d 386, 387–88 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2286, 119 L.Ed.2d 211 (1992); *United States v. Insley,* 927 F.2d 185, 186 (4th Cir.1991); *United States v. Woods,* 888 F.2d 653, 655 (10th Cir.1989), *cert. denied,* 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990); *see United States v. Zackular,* 945 F.2d 423, 424–25 (1st Cir.1991) (limiting holding to the determination that home confinement was not "official detention," while noting that most circuits have determined that "official detention" is comparable to "custody").

Interpreting section 3568, the Former Fifth Circuit held that "custody" is "characterized by incarceration," and that credit against a federal sentence does not accrue "until the prisoner is received at the place of imprisonment." [6] *Polakoff v. United States,* 489 F.2d 727, 730 (5th Cir.1974). The Former Fifth Circuit also determined that a presentence convict's time on a "highly restricted bond" was not "custody" under section 3568 because it was not incarceration.

*Id.* at 728, 730; *see United States v. Mares,* 868 F.2d 151, 152 (5th Cir.1989) (per curiam) (construing section 3568, the Fifth Circuit specifically excluded pretrial release on bail, time spent on bail pending appeal, and time spent on parole or probation, if revoked, from the definition of "custody"). This interpretation is augmented by the Ninth Circuit's conclusion that a pretrial defendant who absconded from a halfway house to which he had been released on a personal recognizance bond could not be prosecuted under 18 U.S.C. § 751(a) for escape because he was not legally in custody. *United States v. Baxley,* 982 F.2d 1265, 1268–70 (9th Cir. 1992).

Dawson was confined to the premises of the halfway house at night only. During the day, he was to work at a job or to seek employment. Such liberty is markedly different from custodial incarceration in a penitentiary.[7] *See United States v. Parker,* 902 F.2d 221, 222 (3d Cir.1990) (holding that confinement "subject to a defendant's being released to go to work, cannot possibly be equated with an equivalent period of imprisonment"). Thus, we have joined other circuits that have determined that custody or official detention time is not credited toward a sentence until the convict is imprisoned, and that release stipulations or imposed conditions that do not subject a person to full physical incarceration do not qualify as official detention.[8]

---

664 (Heaney, J., dissenting). Congress's attempt to clarify any ambiguity in § 3568 and to be precise in § 3585(b) is apparent, if not successful. For example, "custody" occurs at arrest, but an individual subsequently released on personal recognizance without incarceration could not claim that such custody is creditable toward a later imposed sentence. "Official detention," as other circuits have determined, means that an individual must be subject to a *judicial detention order.* For the reasons discussed hereinafter in this opinion, "official detention" is legally distinct from "official release" in court order or form, purpose, and sentence credit effect.

6. *See United States v. Pungitore,* 910 F.2d 1084, 1119 (3d Cir.1990) ("[A] federal sentence does not begin to run until the defendant is delivered to the place where the sentence is to be served."), *cert. denied,* 500 U.S. 915, 916, 111 S.Ct. 2009, 2010, 2011, 114 L.Ed.2d 98 (1991); *Pinaud v. James,* 851 F.2d 27, 30 (2d Cir.1988) (holding that a federal sentence commences when the Attorney General receives the convict-

ed defendant into custody for service of that sentence).

7. The liberty restrictions placed on the pretrial defendant in *Baxley* where at the halfway house to which he had been released on a personal recognizance bond were similar to those imposed upon Dawson:

The *restrictions* on Baxley's activities were *slight:* he was required to report regularly to pretrial services and was subject to travel limitations, but he could remain employed (indeed, he was *required to be employed*) and could come and go during the day as he pleased, as long as he logged the time, purpose, and duration of his trips away from the Center. *In no way did Baxley's "conditions of confinement approach[ ] those of incarceration" sufficient to constitute "custody"* . . . .

*Baxley,* 982 F.2d at 1269 (citation omitted) (emphasis added).

8. We recognize that the definition of "official detention" under § 3585(b) and the definition of

*Spinola v. United States,* 941 F.2d 1528, 1529 (11th Cir.1991) (per curiam) (interpreting section 3568); *see United States v. Cleto,* 956 F.2d 83, 84–85 (5th Cir.1992) (per curiam); *Insley,* 927 F.2d at 186; *United States v. Freeman,* 922 F.2d 1393, 1397 (9th Cir.1991); *Mieles v. United States,* 895 F.2d 887, 888 (2d Cir.1990); *Woods,* 888 F.2d at 655; *Ramsey v. Brennan,* 878 F.2d 995, 996 (7th Cir. 1989); *United States v. Figueroa,* 828 F.2d 70, 70–71 (1st Cir.1987) (per curiam); *Villaume v. United States Dep't of Justice,* 804 F.2d 498, 499 (8th Cir.1986) (per curiam), *cert. denied,* 481 U.S. 1022, 107 S.Ct. 1908, 95 L.Ed.2d 514 (1987); *United States v. Golden,* 795 F.2d 19, 21 (3d Cir.1986); *United States v. Peterson,* 507 F.2d 1191, 1192–93 (D.C.Cir. 1974) (per curiam).

Interpreting 18 U.S.C. § 3585(b), the Supreme Court held that the Attorney General through the BOP, and not district courts, is authorized to compute sentence credit awards *after sentencing. United States v. Wilson,* 503 U.S. 329, 333–35, 112 S.Ct. 1351, 1354, 117 L.Ed.2d 593 (1992); *see United States v. Lucas,* 898 F.2d 1554, 1555–56 (11th Cir.1990) (per curiam) (concluding from the legislative history for section 3585(b) that Congress intended for the Attorney General to have initial discretion to credit a defendant's time in custody prior to sentencing and that this determination has been delegated to the BOP pursuant to 28 C.F.R. § 0.96); *accord United States v. Herrera,* 931 F.2d

761, 763–64 (11th Cir.1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992). To the extent that there is ambiguity in the congressional intent in section 3585(b), the United States Department of Justice through the BOP, which administers or implements, including credits, imposed sentences,[9] has resolved this ambiguity in its following Program Statement on sentence computation issued by the Justice Department and applicable when Dawson was sentenced:

> Time spent in residence in a *residential community center* (or a community based program located in a Metropolitan Correctional Center or jail) ... as a condition of bail or bond ... is not creditable as jail time since the degree of restraint provided by residence in a community center is not sufficient restraint to constitute custody within the meaning or intent of 18 USC 3568. Also, a "highly restrictive" condition of bail or bond, such as requiring the defendant to report daily to the U.S. Marshal, is not considered as time in custody. However, time spent in a *jail-type facility* (not including a community based program located in a Metropolitan Correctional Center or jail) as a condition of bail or bond is creditable as jail time because of the greater degree of restraint.

Federal BOP, Program Statement No. 5880.24(5)(b)(5) (Sept. 5, 1979) (interpreting section 3568).[10] The Seventh Circuit con-

"custody" under habeas statute 28 U.S.C. § 2241 is different. While the Supreme Court has established an expansive definition of custody to confer standing to bring a habeas action, encompassing release on personal recognizance, *Hensley v. Municipal Court,* 411 U.S. 345, 351–53, 93 S.Ct. 1571, 1574–75, 36 L.Ed.2d 294 (1973), this definition "has never been extended to prisoners seeking credit for pre-sentence detention." *Woods,* 888 F.2d at 655 (citing *Mares,* 868 F.2d at 152); *Ortega v. United States,* 510 F.2d 412, 413 (10th Cir.1975) (per curiam).

9. "After a District Court sentences a federal offender, the Attorney General, through the Bureau of Prisons, has the responsibility for administering the sentence." *Wilson,* 503 U.S. at 335, 112 S.Ct. at 1355; *see United States v. Flanagan,* 868 F.2d 1544, 1546 (11th Cir.1989) (per curiam) ("[T]he granting of credit for time served is in the first instance an administrative, not a judicial, function."). In view of *Wilson* and our circuit precedent, it is troubling that the dissent advances the position that district courts can

override the BOP's determination regarding sentence credits. "In *Wilson,* the Supreme Court held that the district court has no authority to grant a defendant credit for *any* time served in detention before sentencing, but rather the *Attorney General has the sole authority to grant credit for time already served.*" *United States v. Daggao,* 28 F.3d 985, 987 (9th Cir.1994) (emphasis added), *cert. denied,* —— U.S. ——, 115 S.Ct. 1390, 131 L.Ed.2d 242 (1995) (holding that the district court could not circumvent Attorney General's determination that in-home, presentence detention of defendant pursuant to release on bond is not applicable for sentence credit by according a downward departure under U.S.S.G. § 5K2.0 based on this detention).

10. A subsequent BOP program statement, which became effective while Dawson was completing his administrative appeals, more specifically delineates the inability to receive sentence credit for presentence residence in a community center:

> "Official detention" is defined, for purposes of this policy, as time spent under a federal

cluded that determining whether confinement in a halfway house is sufficiently like prison to be treated as such for sentence credit "is not a question susceptible of rational determination, at least by tools of inquiry available to judges. It is a matter of judgment, or policy, or discretion, and we are fortunate in having a policy statement by the Bureau of Prisons which opines unequivocally" that it is not. *Ramsey*, 878 F.2d at 996.

Thus, at the time pertinent to Dawson's sentence, the BOP, as the administrating agency, specifically had determined that *release* on bail or bond, despite the conditions, was *not creditable* toward a sentence, but that incarceration time was creditable. At the first appearance of a criminal defendant before a judicial officer after arrest, the defendant is either detained [11] or released, with or without conditions.[12]  18 U.S.C. § 3142(a).

Dawson's case exemplifies both possibilities and the resulting sentence credit consequences. When he was arrested, Dawson was officially imprisoned or detained, for which he received credit against his sentence. Subsequently, he was released on bond to a halfway house and, later, to a safe house, for which he alleges that he improperly did not receive sentence credit. The fact that Dawson did not have a home to which he could be released on bond and, thus, had to reside in a halfway house is inconsequential with regard to sentence credit. "[C]onfinement to the comfort of one's own home is not the functional equivalent of incarceration in either a practical or a psychological sense." *Zackular*, 945 F.2d at 425. For confinement purposes, a federal criminal defendant may be in one of two states: released or detained.[13]  It

---

detention order. This also includes time spent under a *detention* order when the court has *recommended* placement in a less secure environment or in a community based program as a condition of presentence detention. A person under these circumstances remains in "official detention," subject to the discretion of the Attorney General and the U.S. Marshals Service with respect to the place of detention. Those defendants placed in a program and/or residence as a condition of detention are subject to removal and return to a more secure environment at the discretion of the Attorney General and the U.S. Marshals Service, and further, remain subject to prosecution for escape from detention for any unauthorized absence from the program/residence. Such a person is not similarly situated with persons conditionally *released* from detention with a requirement of program participation and/or residence.

A defendant is not eligible for any credits while *released* from detention. Time spent in residence in a community corrections center as a result of the *Pretrial Services Act of 1982* (18 USC §[§] 3152–3154), or as a result of a condition of bail or bond (18 USC §[§] 3141–3143), is not creditable as presentence time. A condition of bail or bond which is "highly restrictive," and that includes "house arrest," "electronic monitoring" or "home confinement"; or such as requiring the defendant to report daily to the U.S. Marshal, U.S. Probation Service, or other person; is not considered as time in official detention. Such a defendant is not subject to the discretion of the U.S. Attorney General, the Bureau of Prisons, or the U.S. Marshals Service, regarding participation, placement, or subsequent return to a more secure environment, and therefore is not in a status which would indicate an award of credit is appropriate (see *Randall v. Whelan*,

938 F[.]2d 522 (4th Cir.1991) and *U.S. v[.] Insley*, 927 F.2d 185 (4th Cir.1991)[)]. Further, the government may not prosecute for escape in the case of an unauthorized absence in such cases, as the person has been lawfully *released* from "official detention."

Federal BOP, Program Statement No. 5880.28(c) (Feb. 21, 1992). Significantly, the program statement specifically and unambiguously states that "[a] defendant is *not eligible for any [sentence] credits while released from detention." Id.* (emphasis added).

11.  If a defendant is detained, then the detention order must include language directing that the defendant be "committed to the custody of the Attorney General for confinement in a corrections facility...."  18 U.S.C. § 3142(i)(2).

12.  If a defendant is released, then the judicial officer must impose the "least restrictive" conditions that "will reasonably assure the appearance of the person as required and the safety of any other person and the community...."  18 U.S.C. § 3142(c)(1)(B). One form of release that can be imposed requires the defendant to "remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court...."  18 U.S.C. § 3142(c)(1)(B)(i). A presentence convict released to a halfway house is placed in the custody of the proprietors of the halfway house, not the Attorney General; thus, such person is not in official detention. *Moreland*, 968 F.2d at 659–60.

13.  Quoting the *Moreland* dissent, the dissent states that the BOP could not deny sentence credit to presentence detainees in county jails. Dissent at 896–97 (quoting *Moreland*, 968 F.2d at 666 (Heaney, J., dissenting)). Both dissents, however, ignore the fact that detention in jail, as

is Dawson's *release status* during the time that he was in halfway and safe houses, rather than official detention, that is determinatives to sentence credit.

Because the BOP's construction is "permissible," "reasonable," and not an "arbitrary, capricious, or manifestly contrary" statutory interpretation, we must defer to it.[14] *Chevron,* 467 U.S. at 843, 844, 104 S.Ct. at 2782; *Jaramillo,* 1 F.3d at 1152–53.[15] "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." [16] *Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793. Additionally, other circuits have concluded specifically that presentence time spent in a halfway house does not constitute "official detention" and is

full physical incarceration, is pursuant to a detention order rather than a released-on-bond order, and thus is creditable toward a prospective sentence.

14. Dawson's argument that the "rule of lenity" requires sentence credit to be given for his halfway and safe house residence is without merit. *See United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). Our statutory interpretation does not concern this ambit of § 3585(b), and the policies underlying the rule of lenity have no application to our analysis.

15. The Third Circuit alone considers the BOP Program Statements to be "internal agency guidelines" that the BOP may alter "at will" and, thus, they are "entitled to a lesser level of deference from the courts than are published regulations subject to the rigors of the Administrative Procedures Act, including public notice and comment." *Koray,* 21 F.3d at 562.

16. Currently, the BOP focuses on "whether the defendant has been 'released' to pretrial services or 'detained' by the Attorney General" to determine whether sentence credit is accorded. *Koray,* 21 F.3d at 562. The dissent takes issue with the BOP's position enunciated in its policy statements. Dawson's halfway house residence, which the dissent characterizes as "functional[ ] 'det[ention],'" clearly is not full physical incarceration pursuant to a detention order, irrespective of the label that the dissent attaches to it. Dissent at 896. Dawson and the dissent's contrary position cannot override the reasoned interpretation of the implementing administrative agency, the BOP.

17. In *Brown,* the Ninth Circuit accorded sentence credit for pretrial residence in a halfway house. We agree with and adopt the en banc

not creditable toward a subsequently imposed sentence. *Moreland,* 968 F.2d at 657–60; *Ramsey,* 878 F.2d at 996–97; *Woods,* 888 F.2d at 656. *But see Brown v. Rison,* 895 F.2d 533, 536 (9th Cir.1990) (concluding under section 3568 that residence in a treatment center as a condition of pretrial release imposed restrictions "too close to incarceration" not to be credited against a sentence).[17] Because Dawson was in release status when he was in the halfway and safe houses and not incarcerated, and because the BOP has determined that time spent in a release state does not qualify as time served in official detention, we hold that this release time is not creditable toward his imposed sentence.[18]

### B. *Equal Protection*

Because he was subjected to the same liberty restrictions in the halfway house [19] as

Eighth Circuit reasoning in *Moreland* and distinguish *Brown* and its progeny because the Ninth Circuit failed to give proper deference to the BOP Program Statement in accordance with *Chevron.* *Moreland,* 968 F.2d at 659.

18. We note that Dawson could have declined to accept the bond release conditions and, thus, he could have begun to accrue credit against his potential sentence had he submitted to incarceration. *Dawson, however, agreed to the terms and conditions of his release.* We further observe that the record is not clear as to whether the sentencing court took into account Dawson's post-plea and post-sentence time in a safe house as part of the government's motion to reduce Dawson's sentence. We do know that Dawson's sentence actually was reduced substantially because of his cooperation with the government.

19. Because of his cooperation with the government, Dawson spent presentence as well as post-sentence time in a safe house. This is inconsequential to our analysis because Dawson would still have been on conditional release and not yet ordered to surrender to the custody of the Attorney General. Thus, he would have had to have been in "official detention," meaning incarceration, before commencement of his sentence to accrue sentence credit. Further, most of the time that Dawson spent in a safe house was for the purpose of assisting the government for which he received a substantial reduction in his sentence. Although Dawson generally represents that the conditions of his safe house residence were a continuation of the conditions of his halfway house residence, he does not complain about any restrictions upon his liberty while in a safe house. Contending that the safe house was "official detention," he solely requests sentence credit

convicts, who were serving their sentences there and receiving sentence credit, Dawson also contends that denying him sentence credit for his tenure violates equal protection. Accordingly, we must decide whether providing sentence credit to a convict serving his sentence in a halfway house and denying such credit to a defendant before adjudication of guilt or sentencing infringes equal protection. Under *Wilson* and *Chevron*, we recognize that the Attorney General through the BOP, determines presentence credit, and not the courts. We review solely the constitutional consequences or effect of placing defendants prior to adjudication of guilt and sentencing and postsentence convicts serving their sentences in a halfway house under identical conditions and giving only the postsentence convicts sentence credit.

Because neither a suspect nor a quasi-suspect class is involved, we review this governmental decision for a rational basis. *City*

of *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440–42, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985); *see United States v. Woods*, 888 F.2d 653, 656 (10th Cir.1989), *cert. denied*, 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990) (holding that a rational basis analysis is applicable to equal protection claims of presentence defendants residing in a halfway house). Under this review standard, Dawson prevails only if (1) persons similarly situated are treated differently by the government, *and* (2) the government fails to provide a rational basis for the dissimilar treatment. *Cleburne*, 473 U.S. at 439–42, 105 S.Ct. at 3254–55. Consequently, if the two groups are not similarly situated, then we need not proceed with the constitutional analysis because "there is no equal protection violation." *Woods*, 888 F.2d at 656. Our first inquiry, therefore, is to determine whether pretrial, presentence defendants and postsentence convicts are similarly situated.[20]

for this time. As we have analyzed above in section II.A., release, whatever the conditions, cannot be official detention; only full physical incarceration time served presentence is creditable toward an imposed sentence. Dawson's failure to particularize the conditions of his safe house residence leads us to believe that he was in less restrictive circumstances than his halfway house residence, which did not qualify for sentence credit.

Significantly, as to his equal protection claim, Dawson, as a halfway house resident prior to his plea and sentencing, compares his sentence credit treatment to postsentence convicts residing in the halfway house already serving their sentences and not to pretrial, presentence defendants or postsentence convicts, who had not commenced serving their sentences. He does not compare his safe house residence to any other group of individuals. Accordingly, for our equal protection analysis, we likewise compare Dawson's pre-plea, presentence halfway house residence with that of postsentence convicts serving their sentences as to sentence credit.

**20.** We are mindful of our decision in *Johnson v. Smith*, 696 F.2d 1334 (11th Cir.1983) (interpreting section 3568), finding an equal protection violation in not crediting pretrial time spent by a defendant in a halfway house, while postsentence convicts received credit. In addressing this issue, other circuits have criticized or distinguished *Johnson*, upon which Dawson relies. *See, e.g., Moreland v. United States*, 968 F.2d 655, 660 (8th Cir.) (en banc) (plurality opinion), *cert. denied*, —— U.S. ——, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992); *United States v. Insley*, 927 F.2d 185, 187 (4th Cir.1991); *Woods*, 888 F.2d at 656–57; *Ramsey v. Brennan*, 878 F.2d 995, 996–97 (7th

Cir.1989). We distinguish *Johnson* procedurally and analytically.

In *Johnson*, the government failed to differentiate presentence defendants and postsentence convicts in the district court, gave no reason why postsentence convicts were credited while presentence defendants were not, and conceded that they actually were similarly situated. *Johnson*, 696 F.2d at 1338–40. Consequently, our court refused to permit appellees to assert for the first time on appeal that pretrial defendants and postsentence convicts were not similarly situated. *Id.* at 1338. Far from holding that presentence defendants and postsentence convicts are similarly situated as a matter of law, the panel stated:

We do not base our decision on any determination as to whether or not post-sentence and pre-sentence detainees are always similarly situated under § 3568 or whether or not a rational reason for disparate treatment of the two groups could ever be shown. Further, *this decision does not establish a constitutional or statutory right to credit for all pre-sentence detainees for time spent at this center or under conditions similar to the center.* Whether certain conditions are sufficiently restrictive to qualify an inmate as being "in custody" for purposes of § 3568 is a determination properly left in the first instance to the appropriate administrative agency.

*Id.* at 1338–39 (footnotes omitted) (emphasis added); *see id.* at 1338 n. 5 ("[T]his decision does not require a resolution of these issues [whether presentence defendants and postsentence convicts are similarly situated or whether a rational reason for disparate sentence credit treatment can be shown], and we express no opinion as to

Even if pretrial, presentence defendants and postsentence convicts are treated equally [21] while residing in a halfway house, "as a matter of law ... their divergent legal status negates the possibility that they are similarly situated." *Id.; accord Moreland v. United States,* 968 F.2d 655, 660–61 (8th Cir.) (en banc) (plurality opinion), *cert. denied,* —— U.S. ——, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992). Significantly, postsentence halfway house residents have been adjudicated guilty. They are serving their sentence at a minimally secure halfway house pursuant to the Attorney General's discretion to determine the conditions of punishment.[22] Consequently, postsentence convicts who escape or attempt to escape from a halfway house are subject to criminal prosecution, 18 U.S.C. § 751(a),[23] or punishment by the BOP. *See*

whether appellants would prevail if their arguments were properly presented....").

Importantly, there was no analysis of the differences between presentence defendants and postsentence convicts residing in a halfway house to determine if they are similarly situated, which is the threshold inquiry under *Cleburne,* subsequently decided by the Court. At a minimum, we limit *Johnson* because of its procedural posture, which apparently inhibited the constitutional analysis. Moreover, we question the viability of the rationale and result in *Johnson* after the Supreme Court's later decisions in *Chevron* and *Wilson.* *Chevron* requires courts to defer to an administrating agency's reasonable interpretation of a statute, and the *Johnson* court failed to adhere to the BOP's Program Statement construing § 3568. Further, the *Johnson* court affirmed a writ of mandamus issued by the district court directing defendants-appellants, the Attorney General, the Director of the United States Bureau of Prisons, and the Warden of the subject federal penitentiary, to credit the petitioner's presentence time spent in a community treatment center against his sentence. *Wilson* explicitly holds that only the Attorney General through the BOP may determine and issue sentence credit for presentence custody, and not the courts.

In view of these intervening Supreme Court precedents, *Johnson* does not control this case and appears to be overruled. *See County of Monroe v. United States Dept. of Labor,* 690 F.2d 1359, 1363 (11th Cir.1982) ("[A] three-judge panel may not disregard precedent set by a prior panel *absent an intervening Supreme Court decision* or *en banc* circuit decision." (emphasis added)); *see also Smith v. Duff & Phelps, Inc.,* 891 F.2d 1567, 1570 n. 6 (11th Cir.1990) (holding that directly applicable Supreme Court decisions "require[ ] this Court to overrule its prior holdings"). In this case, the government presented the district court with distinctions between pretrial, presentence defendants and postsentence convicts in a halfway house, and it provided reasons for those distinctions relating to sentence credit.

21. The dissent acknowledges that Dawson resided in the halfway house twelve hours a day. The *Moreland* dissent, upon which the dissent in this case relies, recognized that the appellant was *"completely confined* twenty-four hours a day in the Center during his first two weeks of custody there." *Moreland,* 968 F.2d at 665 (Heaney, J., dissenting). Dawson was not subjected to twenty-four hours residence in the halfway house at any time. Even with the initial halfway house residence of twenty-four hours a day, the *Moreland* en banc court nevertheless determined that the appellant's pretrial time at the halfway house was not creditable toward his eventual sentence because he was released on bond and, thereby, in a different legal status from an inmate incarcerated pursuant to a detention order. *Moreland,* 968 F.2d at 660–61.

22. When the BOP receives a sentenced defendant into its custody, it

initiates a procedure to determine the postsentence defendant's security level (*i.e.,* Minimum, Low, Medium, or High). In making this determination, the BOP considers a myriad of factors which include aspects of the conviction, judicial recommendations, public safety factors, potential to cause institutional disruption and escape potential. Bureau of Prisons, Security Designation & Custody Classification Manual, Program Statement 5100.3, Ch. 8 (1991). Based upon the security level, postsentence defendants are assigned to high security facilities (penitentiaries); medium security facilities with double fences, gun towers and armed perimeter patrols; low security facilities with a single fence, no gun towers and reduced security; or minimum security with no fences and minimal security (*e.g.,* halfway houses). *Moreland,* 968 F.2d at 660–61; *see* 18 U.S.C. § 4001(b)(2) (authorizing the Attorney General to place prisoners in halfway houses).

23. Pursuant to 18 U.S.C. § 751(a), it is a crime for a postsentence convict to escape or attempt to escape "from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General." *Id.* While a presentence defendant who violates the conditions of his release is not subject to punishment by the BOP, he nevertheless is "subject to a revocation of release, an order of detention, and a prosecution for contempt of court," 18 U.S.C. § 3148(a), and further can be prosecuted and punished for failure to appear under 18 U.S.C. §§ 3146(a), (b). While the dissent refers to these sanctions as "Bureau of Prisons-type administrative punishment," Dissent at 896, clearly they are not the same as the punishment incurred when a convict escapes from the custody of the Attorney General.

*United States v. Baxley*, 982 F.2d 1265, 1269 & n. 8 (9th Cir.1992) (distinguishing between pretrial release to a halfway house on a personal recognizance bond and post-incarceration residence in a halfway house as to prosecution for escape).

Importantly, postsentence convicts serving part of their sentence in a halfway house are "not given credit for time served in the same sense in which [Dawson] is seeking credit." *Ramsey v. Brennan*, 878 F.2d 995, 997 (7th Cir.1989). The time spent in a halfway house is credited for postsentence convicts because it *is* part of such convicted criminals' sentence. Further, placement in a halfway house serves a particular purpose for postsentence convicts, who are in a "twilight zone between prison and freedom." *Id.* at 996. The BOP has determined that they are capable of residing in minimally secure confinement, and that work release in this environment "facilitate[s] the re-entry of convicts into society by making the last stage of their confinement transitional—hence the apt name 'halfway house.'" *Id.* at 997.

In contrast, Dawson's confinement in a halfway house was *before* his plea or adjudication of guilt and subsequent sentence.[24] "A presentence defendant is under the custody of the proprietors of the halfway house" to whom he has been conditionally released "to impose the least restrictive conditions possible upon the defendant's liberty." *Moreland*, 968 F.2d at 660; *see Randall v. Whelan*, 938 F.2d 522, 525 (4th Cir.1991) ("There exists a strong presumption that 'custody' refers to the legal authority of the custodian rather than to actual housing conditions."). Significantly, Dawson's conditional release was not for a punitive purpose. *See United States v. Edwards*, 960 F.2d 278, 284 (2d Cir.1992) ("[R]elease on conditions of bail is not pursuant to a conviction and, indeed, is not punishment...."). Prior to adjudication of guilt, "the judicial officer must maintain the presumption of innocence" in determining the conditions of release. *Moreland*, 968 F.2d at 660 n. 9; 18 U.S.C. § 3142(j). Thus, Dawson was placed in a halfway house "to protect the community and assure [his] presence at trial and sentencing." *Woods*, 888 F.2d at 656; 18 U.S.C. § 3142(c); *see Cohen v. United States*, 82 S.Ct. 526, 528, 7 L.Ed.2d 518 (1962) ("The purpose of a bail bond is to insure that the accused will reappear at a given time by requiring another to assume personal responsibility for him...."). While confinement in a halfway house has a transitional or rehabilitative purpose for a postsentence convict, that objective does not apply to a pretrial or presentence defendant "moving in the opposite direction." *Ramsey*, 878 F.2d at 997.

**24.** In district court and on appeal, the government has enumerated differences between pretrial, presentence defendants and postsentence convicts who reside in a halfway house for the purpose of distinguishing them as to sentence credit:

[T]here are at least four ways that a pre-trial inmate and a sentenced inmate residing in a halfway house differ (and therefore are not "similarly situated"): (1) the pre-trial inmate is not subject to the rules and regulations of the Bureau of Prisons; (2) the pre-trial inmate is not subject to prosecution for escape; (3) the pre-trial inmate is not preparing for integration into a largely unsupervised environment at the end of his sentence; and (4) the pre-trial inmate has the opportunity to ask that the sentencing court take into account his halfway house confinement for purposes of determining his sentence. The placement of a sentenced inmate into a halfway house can allow prison authorities to lessen the problems an inmate may experience as he makes the transition from custody status to that of a free citizen. The placement of a pre-trial inmate into

a halfway house as a condition of bond is strictly to insure the presence of the inmate at trial and to ensure the safety of the community. It would be improper for the judicial officer to place conditions of pre-trial bond designed to prepare an unsentenced inmate for some subsequent incarceration, especially where, as in the petitioner's case, the defendant had yet to be convicted.

R1–9–10–11 (Government's Response to Order to Show Cause).

The dissent states that the government has not articulated a rational reason for the disparate treatment in sentencing credit for presentence and postsentence halfway house residents, and that it has found none. Dissent at 897. Because we hold that presentence and postsentence halfway house residents are not similarly situated, we do not progress to the second part of the *Cleburne* analysis. Even if we had found them to be similarly situated, then the government's response to the show cause order would provide ample reasons for the difference in sentence credit treatment to surmount the rational basis test.

Accordingly, Dawson's comparison of his halfway house residence as a pretrial, pre-sentence defendant with postsentence convicts as to sentence credit is inapposite. The appropriate similarly situated comparison would be to other pretrial or presentence halfway house residents. *See Woods*, 888 F.2d at 656; *see also Edwards*, 960 F.2d at 284 (excluding a presentence defendant from the "class" of postsentence convicts; a presentence defendant "is not similarly situated to convicted persons who are eligible for home detention"). We hold that pretrial, presentence defendants and postsentence convicts are not similarly situated because they were placed in the halfway house "under significantly different legal conditions." [25] *Moreland*, 968 F.2d at 661.

While pretrial, presentence defendants and postsentence convicts may be in the same halfway house and subjected to identical conditions, we conclude that they are not similarly situated legally because their residence in a halfway house serves a fundamentally and functionally different purpose. Thus, it is not the type of detention, but the respective difference in legal status that is dispositive. The consequent divergent sentence credit treatment results directly from the different legal status occupied by pretrial, presentence defendants and postsentence convicts. Therefore, the BOP does not violate equal protection in according sentence credit to postsentence convicts, but not to pretrial or presentence defendants. *See Fraley v. United States Bureau of Prisons*, 1 F.3d 924, 926 (9th Cir.1993) (holding that a presentence defendant is not similarly situated with a postsentence convict and denial of sentence credit does not violate equal protection).

## III.  CONCLUSION

Dawson has challenged the failure of the BOP to credit his sentence with time that he spent on conditional release in halfway and safe houses as a misapplication of section 3585(b) and a violation of equal protection. As we have analyzed, the determination of sentence credit is solely within the discretion of the BOP and not the judiciary. Because Dawson, as a pretrial, presentence defendant residing in a halfway house, is not similarly situated with postsentence convicts, the BOP does not violate equal protection by not cred-

**25.** Rather than acknowledge the difference in legal status occupied by pretrial, presentence and postsentence halfway house residents, the dissent focuses on the "degree of confinement or restraint." Dissent at 896. For the reasons discussed herein, we consider the "comparative degree of confinement of the two groups" to be inappropriate analysis. Dissent at 897–98. Clearly, our jurisprudence recognizes the significance of legal status in precluding individuals from being considered similarly situated, although their conduct may be the same. Examples include criminal acts by minors and adults, resident aliens and illegal aliens, and married and single wage earners for purposes of the tax laws.

Additionally, under the dissent's expansive definition of "official detention," virtually *any* release on bond, such as house arrest, could qualify for sentence credit. *See United States v. Wickman*, 955 F.2d 592, 593 (8th Cir.1992) (en banc per curiam) ("[W]e have concluded that the house arrest restrictions that were placed upon [appellant] as conditions of his pre-trial release did not constitute 'official detention' within the meaning of § 3585(b)."). The dissent's position portends erosion of the penal purpose of sentencing, the potential of retroactive application, and intrudes into the exclusive domain of the BOP to determine sentence credit as enunciated in *Wilson*.

According sentence credit by legal status as "detained" or "released" is sensible, certain, and easily applicable. Scrutinizing conditions of release as to degree of confinement, as the dissent endorses, would impede both the penal and judicial systems:

The construction here given to "official detention" [finding presentence halfway house detention unavailable for sentence credit under § 3583(b) or an equal protection violation] also has practical benefits. It provides a bright line rule which benefits all by providing greater certainty. At the same time the burden on the judicial system is minimized. The Ninth Circuit's interpretation focuses on the degree of restraint as opposed to the authority of the custodian. *The degree of restraint will have virtually infinite variations.* This will increase the burden on the judicial system resulting in more requests for judicial review that require the court to make fact sensitive inquiries. *An inescapable consequence will be inconsistent decisions and increased uncertainty.*

*Robichaux v. Warden, Federal Detention Ctr.*, 878 F.Supp. 888, 891 (W.D.La.1995) (emphasis added) (dismissing habeas petition and holding that presentence residence in a halfway house was unavailable for sentence credit, although the defendant spent four months in the most restrictive component of the halfway house, where he was only allowed to leave to meet with his attorney or probation officer, to appear in court, and to obtain medical treatment).

iting his halfway house tenure against his sentence while crediting the sentences of postsentence convicts. Accordingly, we AFFIRM.

CONWAY, District Judge, dissenting:

## I. HALFWAY HOUSE

I dissent from the majority's conclusion that Dawson is not entitled to sentence credit for his 104–day stay at the halfway house. The Bureau of Prisons' refusal to credit Dawson's sentence for that period of confinement violated 18 U.S.C. § 3585(b)(1) and denied Dawson equal protection. In my view, Judge Heaney's dissent in *Moreland v. U.S.*, 968 F.2d 655, 663–67 (8th Cir.) (Heaney, J., dissenting), *cert. denied*, — U.S. —, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992), provides the proper analytical framework for resolution of this issue.

### A. *"Official Detention"*

As it appears in 18 U.S.C. § 3585(b), the phrase "official detention" is not ambiguous. *Moreland*, 968 F.2d at 664 (Heaney, J., dissenting). Dawson's confinement at the halfway house clearly was "official." He resided there pursuant to a court order requiring him to do so. That the operative order was a "release" order is largely a matter of semantics. Further, regardless of the word or phrase used to describe Dawson's stay at the halfway house, it cannot seriously be disputed that he was functionally "detained." Since "official detention" is unambiguous, the Bureau of Prisons' interpretation of the phrase is not entitled to any particular deference.

Whether Dawson is entitled to sentence credit under § 3585(b)(1) depends on the degree of confinement or restraint imposed on him during his stay at the halfway house. *Id.* at 664 (Heaney, J., dissenting). "[A] defendant subject to conditions as restrictive as incarceration may receive sentence credit." *Id.* at 664 (Heaney, J., dissenting).

The record reflects that Dawson was subject to the same conditions of confinement as postsentence inmates residing at the halfway house. Dawson was completely confined for 12 hours during each 24–hour period, from 7:00 p.m. to 7:00 a.m. His presence was monitored by nightly bed checks and counts. If he left the facility, he was required to punch a time card and to provide the address and phone number of his destination. While away from the facility, Dawson was required to check in every three hours. While on the premises, he was prohibited from using alcohol, from engaging in sexual activity, and from entering other residents' rooms. He could only use the telephone for 15 minutes at a time. He was required to provide random urinalysis samples and was subject to "on demand" searches of his person and property. He also was required to attend on-premises meetings. The facility placed limitations on his clothing and personal appliances. He could only receive "pre-approved" visitors, and all visits were required to take place in a "visiting room."

Residents were assigned work or maintenance duties. Those who did not have outside employment, such as Dawson, were required to seek employment daily and to submit a list of prospective employers contacted pursuant to that requirement. The facility deducted 25% of the gross weekly earnings of residents who were employed.

If Dawson violated facility rules, he was subject to Bureau of Prisons—type administrative punishment. Unauthorized absences were punishable by loss of privileges, revocation of bond or criminal sanctions.

The record thus demonstrates that Dawson was constantly and closely supervised during his stay at the halfway house, and was physically incarcerated for at least 12 hours each day. These particular circumstances constituted "official detention", within the plain and ordinary meaning of that phrase. Any other interpretation is "unreasonable and contrary to the considerations of fairness that inspired Congress' decision to provide credit for time served." *Moreland*, 968 F.2d at 665 (Heaney, J., dissenting) (citing *Brown v. Rison*, 895 F.2d 533, 536 (9th Cir.1990)).

### B. *Equal Protection*

Presentence detainees, such as Dawson, and postsentence detainees were subject to the same rules, restrictions and conditions of

confinement while at the halfway house. Under the majority's analysis, Dawson will not receive sentence credit, even though identically-treated postsentence detainees did.

In my view, presentence and postsentence detainees at this particular halfway house were similarly situated for equal protection purposes. Rather than comparing the legal custody "status" of each group, a court should focus on the comparative degree of confinement of the two groups.

In the section of his brief devoted to the equal protection issue, Appellee Scott has not articulated a rational reason for this disparate treatment. I find none. In the words of Judge Heaney,

> I do not see how a delineation of the paths by which people become residents or a recitation of official goals and reasons leading to their residential status can adequately serve as a rational basis for differing treatment. Nobody would contend that the Bureau of Prisons could justify a denial of sentence credit to presentence detainees in county jails because their legal status differed from postsentence defendants. Under the statute, the degree of confinement is what is at issue, and the restraints on [the appellant's] liberty at the [halfway house] were the same as those who were concluding a sentence there. Moreover, ... the restrictions on [the appellant's] liberty were among the most severe that could have been imposed as a condition of pretrial release.

*Moreland,* 968 F.2d at 666–67 (Heaney, J., dissenting).

Denying Dawson sentence credit for his halfway house stay ignores the reality of his confinement and elevates form over substance.

## II. SAFE HOUSE

I also dissent from the majority's determination that Dawson should not receive sentence credit for his stay in the safe house, and the reasons underpinning that conclusion. Again, the pertinent issue is whether the conditions at the safe house were as restrictive as incarceration. In my view, that question cannot be resolved on the present record.

In the proceedings below, Dawson detailed the conditions of his confinement at the halfway house. He was not nearly as specific about conditions at the safe house. However, Dawson filed at least three documents in the district court suggesting that the conditions at the safe house were the same as those at the halfway house.

The first document is one Dawson originally submitted to the BOP in connection with the BOP's administrative remedy process. Therein, Dawson indicated that when he was transferred from the halfway house to the safe house, "[t]he conditions of my restrictions were continued by the court at the 'safe house.'" R. 12, Exhibit "A1" (Request for Administrative Remedy, attached to Petitioner's Affidavit in Opposition to Respondent's Motion for Summary Judgement [sic]).

The second document is also one Dawson originally filed during the BOP administrative review process. In this document, Dawson stated that a pretrial services representative told him that he would continue to be under the same restrictions as imposed on him at the halfway house. R. 12, Exhibit "A4" (Attachment 1 to Request for Administrative Remedy) at para. 7.

Finally, Dawson filed an affidavit in which his criminal defense counsel stated that "[a]fter discussions with Pretrial Services, I informed my client that he would still be subject to all of the conditions of custody that were imposed upon him at [the halfway house]." R. 13, Exhibit "E23" (Affidavit of Charles H. Reid, Esq., attached to Petitioner's Opposition to Respondent's Motion for Summary Judgement [sic] and Cross—Motion for Partial Summary Judgement [sic]) at para. 9.

These submissions suggest that the conditions actually imposed on Dawson at the safe house may have been as restrictive as incarceration. However, the record on this point is not nearly as clear as with respect to the degree of confinement at the halfway house. Accordingly, I would remand with directions to the district court to make findings concerning the conditions of confinement Daw-

son actually experienced at the safe house, and to determine whether those conditions were as restrictive as incarceration.