[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14950
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2010
JOHN LEY
CLERK

D. C. Docket No. 04-00115-TP-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERNESTO GARCIA HERNANDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 27, 2010)

Before BIRCH, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Ernesto Garcia Hernandez ("Garcia"), a federal prisoner, appeals the

revocation of his supervised release, pursuant to 18 U.S.C. § 3583(e), and the

district court's decision to sentence him to serve an additional 30 months of imprisonment, to be followed by 24 months of supervised release.[1] For the following reasons, we affirm.

## I. BACKGROUND

In 2000, Garcia pled guilty to one count of conspiracy to possess with intent to distribute cocaine in excess of 500 grams, in violation of 21 U.S.C. §§ 841(a)(1) and 846. R1-1 at 2, 4. Before sentencing, a Presentence Investigation Report ("PSI") found that his adjusted offense level was 23, his criminal history category was II, and his guidelines range was 51-63 months. A federal court in Texas sentenced him to 60 months of imprisonment, followed by four years of supervised release. Id. at 5-6. Under the conditions of Garcia's supervised release, he was prohibited from: (1) committing another federal, state, or local crime; (2) frequenting places where controlled substances are illegally sold, used, distributed, or administered; and (3) associating with any persons engaged in criminal activity. Id. at 7. Garcia did not appeal his conviction or his sentence.

The BOP released Garcia from prison in December 2003. R1-2 at 1. Texas court officials transferred jurisdiction over him to the Southern District of Florida.

---

[1]According to the Bureau of Prisons ("BOP"), Garcia was released on 27 April 2010. We conclude that his release does not render his appeal moot, however, because he is still serving a term of supervised release, which imposes restrictions on his liberty and could be altered following success on appeal. See Dawson v. Scott, 50 F.3d 884, 886 n.2 (11th Cir. 1995).

R1-1 at 1.

In December 2004, a probation officer petitioned the court to revoke Garcia's supervised release. R1-2. The district court responded by revoking Garcia's supervised release and sentencing him to an additional six months of imprisonment, followed by three years of supervised release. R1-12. Garcia did not appeal from this judgment.

BOP officials released Garcia again in July 2005. R1-14 at 1. In March 2008, a probation officer filed the present petition to revoke his supervised release. Id. at 2-3. The petition alleged five violations. Id. Each of these included the mandatory condition to refrain from personally violating the law, and were based on committing the following state crimes, as reflected by his arrest by Miami police in February 2008: (1) conspiracy to commit armed cocaine trafficking; (2) conspiracy to deliver marijuana; (3) conspiracy to commit armed robbery; (4) possession of a firearm by a convicted felon; and (5) use of a firearm during the commission of a felony. Id. at 2. The petition to revoke did not mention any of the standard conditions, including that he avoid: (i) places where controlled substances were illegally sold, used, distributed, or administered; and (ii) associating with persons engaged in criminal activity. See id. Based on this petition, officials arrested Garcia and placed him in federal custody. R1-19.

In July 2009, Garcia, through counsel, moved for leave to enter a guilty plea on the supervised release violations. R1-39. At a hearing on 3 September 2009, Garcia testified that he wanted to plead guilty as to "the technical violation [of the terms of supervised release] but not right now for the charge in the State." R7 at 7. Garcia later told the court that he was arrested only because he gave Leon Quadra, the alleged co-conspirator who was in the car with Garcia at his arrest, a ride and that he knew nothing. Id. at 25-27. The district court implicitly denied Garcia's motion to plead guilty and scheduled a revocation hearing for 17 September 2009. Id. at 28-29, 34.

At that hearing, Garcia appeared with counsel and again denied committing the crimes alleged in the petition. R8 at 8. During its opening statement, the government proffered the following:

> After the defendant was arrested, he gave a statement. He was Mirandized. He waived his Miranda warnings and agreed to speak to police. And during that statement, which was recorded, the defendant admitted that he was contacted sometime earlier by his co-conspirator and that they were going to rob [a] confidential informant. Of course they didn't know at the time that the confidential informant was working with law enforcement, but the plan was to conduct this robbery.
>
> The defendant admitted that he knew a large amount of money was at stake. He admitted that he and

4

his co-conspirator agreed to split the proceeds of the robbery. He indicated that he -- admitted that he spoke to the confidential informant on previous occasions to negotiate the transaction. He admitted that he borrowed a friend's car for the purposes of traveling to and from the meet location and that he also tinted the windows of that car the day before this incident.

Your Honor will hear testimony from a second witness, Sergeant Abascal from the Miami Police who will talk about that interview and about those statements and other statements that the defendant made regarding this incident.

Id. at 11-12. Defense counsel did not object to the preceding and declined to make an opening statement. Id. at 12.

The government called one witness, Miami Police Detective Alexander Lamprou, to show that Garcia conspired with another person to rob a confidential informant ("CI") during a drug deal. Id. at 9-10. Detective Lamprou testified that he worked with the CI to coordinate a drug deal with Garcia's alleged co-conspirator, Leon Quadra, who was known to the CI. Id. at 14-16, 24. During a controlled phone conversation between the CI and Quadra, which Lamprou monitored, Garcia took the phone from Quadra and said that he would determine the terms of the deal: in exchange for two kilograms of cocaine and $120,000, they would give the CI fifty pounds of hydroponic marijuana. Id. at 14, 18. The parties arranged to meet the next day, but Garcia and Quadra did not show. Id. at 20.

5

Later that day, the parties agreed to complete the deal the following day at a different location.  Id.

Lamprou testified that Garcia and Quadra approached the location at the appointed time in a car owned by another individual but driven by Garcia.  Id. at 20-21, 30.  As they neared the meeting place, Quadra and the CI were speaking on the phone to coordinate where they would park.  Id. at 27-28.  After each identified his vehicle to the other, Garcia pulled alongside the CI's truck.  Id. at 20-21, 27-28.  At that moment – before any dealings with the CI occurred – police approached the car Garcia was driving and arrested him and Quadra.  Id. at 27-29.  As Detective Lamprou pulled Garcia from the car, a "Taser" gun and pepper spray fell from his lap onto the ground.  Id. at 21, 32.  Police searched the car and found a .9 millimeter handgun "in the passenger floorboard," and two large duffle bags containing vitamin pills, duct tape, and flex cuffs in the trunk.  Id. at 21-22.

Detective Lamprou admitted that, although the CI knew Quadra, the CI had never met or spoken to Garcia over the phone before the monitored call was placed.  Id. at 24-26.  Detective Lamprou further admitted that he had never met Garcia or talked to him on the phone and that he did not really know if the person who took the phone from Quadra and spoke to the CI was Garcia.  Id. at 26-27.  Detective Lamprou also testified that Garcia was arrested because he was present

6

where the drug transaction was to occur and that, when he arrested Garcia, he did not know if he was involved in the drug and robbery conspiracies.  Id. at 28-30. Finally, Detective Lamprou testified that he had not run a test on the recording of the conversation to verify that Garcia was the individual who spoke to the CI.  Id. at 26.

The government sought to introduce the recordings of the controlled calls between the CI and Garcia's co-defendant.  Id. at 33-37.  Defense counsel  objected on the grounds that neither the CI nor the co-defendant testified as to the authenticity of the conversation allegedly involving Garcia.  Id. at 37.  The court overruled the objection, but allowed into evidence only the call allegedly involving Garcia.  Id. at 38.

The government also indicated that it had a recording of Garcia's post-Miranda[2] statement.  Id. at 34, 35.  Defense counsel objected to admission of that statement, but this was overruled.  Id. at 37-38.

Garcia did not testify or otherwise present any evidence.  Defense counsel did present a closing argument, however, asserting that, based on the evidence introduced at the hearing, the government did not meet its burden of proof that Garcia committed any crimes.  Id. at 41.  Defense counsel noted that, although the

---

[2] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

7

government proved that Garcia was present when the arrests took place and had a Taser gun in his lap, it did not show that he was the person who grabbed the phone from Quadra and spoke to the CI or that he knew about the gun in the car or about the contents of the trunk. Id. at 41, 49-50. Defense counsel asserted that Garcia had simply been giving a ride to a friend and that there was insufficient evidence to show that he "knew what was happening or that he was participating in any way, shape, or form." Id. at 42.

The district court found that the evidence was insufficient to find that Garcia violated his release terms by conspiring to commit armed robbery. Id. at 50. However, the court found

> . . . that the evidence based upon Detective Lamprou's testimony [was] sufficient without any other testimony [to show] that [Garcia] violated the conditions of supervised release and that there [was] sufficient evidence by the greater weight of the evidence that he agreed with others to commit armed cocaine trafficking, deliver marijuana, and possessed the firearm as a convicted felon and possessed or used the firearm during the commission of the felony, the drug trafficking.

Id. at 50-51. The court also stated that "[Garcia was] talking about drugs. I have to accept [that] because I find credible Lamprou's testimony that [Garcia] said, I'm the one who does the negotiating here; and the guns are there." Id. at 57.

At the beginning of the sentencing portion of the revocation hearing, the

8

district court stated that the applicable guideline range was, when "computed with a Criminal History Category of II . . . 15 to 21 months." Id. at 51. The government requested a sentence above the advisory guideline's 30-month maximum. In support of its request, the government emphasized that this was Garcia's second violation of supervised release, the crime he committed in the instant case was a crime of violence, and he had an extensive prior criminal history that included armed home invasion and trafficking in cocaine. Id. Defense counsel, in turn, asked for a sentence of time served – 17.5 months – which counsel stated was within the applicable guideline range. Id. at 53-54. The parties agreed that the statutory maximum was 30 months of imprisonment. See id. at 51-52.

Garcia asked the court to consider the fact that, while in prison, he saved a prison official from being stabbed. Id. at 55. He had no support for this assertion but the court noted that, if true, it was admirable. Id.

The court revoked Garcia's supervised release and, after stating that it had considered all of the § 3553(a) factors, sentenced him to 30 months of imprisonment. Id. at 57. After a probation officer informed the court that the maximum term of supervised release was two years, the court imposed two years of supervised release. Id. at 57. Specifically, the court stated that, in light of the sentencing factors of deterrence and the need to protect the public, "30 months is

9

inadequate. It's too low. I cannot sentence him below that. The only way I can sentence him below that would be if there was an agreement." Id. at 56. The court indicated that the presence of a gun was enough to find a violation of supervised release, as was the discussion Garcia had with the CI about drugs. Id. at 56-57. The court emphasized the seriousness of the firearm and drug offenses and stated that, though the flex handcuffs and duct tape were not enough to prove the robbery charge, their presence in the trunk was "suspicious." Id. The court stated that Garcia would receive credit for the time he spent in federal detention, but not for the time he spent in state custody. Id. at 58. At the conclusion of the hearing, Garcia objected to a sentence above the applicable guideline range, which the court implicitly overruled. Id. at 58-59.

The court entered a final judgment in the case on 21 September 2009. R1-44. Though Garcia filed a notice of appeal the next day, briefing was not completed – and the PSI not filed – until March 2010. R1-45. According to the BOP website, Garcia was released from custody 27 April 2010, presumably after receiving credit for time served before his final revocation hearing.

## II. DISCUSSION

On appeal, Garcia raises three points. First, he argues that the government failed to prove the violation charges by a preponderance of the evidence. Second,

he argues that the district court improperly permitted a police detective to testify that he was the individual on a monitored call who negotiated the terms of a drug transaction with a CI. Third, he argues that his prison sentence is substantively unreasonable.

A.    *Sufficiency of the Evidence*

We review "a district court's revocation of supervised release for an abuse of discretion." United States v. Velasquez, 524 F.3d 1248, 1252 (11th Cir. 2008). "Under 18 U.S.C. § 3583(e), a district court may, upon finding by a preponderance of the evidence that a defendant has violated a condition of supervised release, revoke the term of supervised release." United States v. Sweeting, 437 F.3d 1105, 1107 (11th Cir. 2006) (per curiam). "So long as the basis of the trial court's decision is supported by the record and does not involve misapplication of a rule of law, . . . it will be rare for an appellate court to conclude that the sentencing court's determination is clearly erroneous." United States v. Rodriguez De Varon, 175 F.3d 930, 945 (11th Cir. 1999) (en banc) (emphasis omitted).

Supervised release violations are categorized by grade. See U.S.S.G. § 7B1.1(a). Conduct that involves a controlled substance or firearm possession and that constitutes a state offense punishable by a term of imprisonment exceeding one year is a Grade A violation. Id. § 7B1.1(a)(1). The guidelines state

11

that "[u]pon a finding of a Grade A . . . violation, the court shall revoke . . . supervised release." U.S.S.G. § 7B1.3(a)(1). "If the defendant possesses a firearm . . . or otherwise violates a condition of supervised release prohibiting the defendant from possessing a firearm . . . the court shall revoke the term of supervised release and require the defendant to serve a term of imprisonment." 18 U.S.C. § 3583(g)(2).

In Florida, it is against the law to conspire to traffic in cocaine, or to deliver that drug. See Fla. Stat. § 893.135(1). Firearm possession by a convicted felon is likewise illegal, as is using a firearm during the commission of a felony. Id. §§ 790.23(1), 790.07(2).

Independent of the disputed phone call evidence, authorities observed Garcia and a co-conspirator (Quadra) at the prearranged location for the drug deal, and found a Taser gun and pepper spray in his lap, a handgun on the front floor of the car, and duffle bags with heavy tape in the trunk as they arrested Garcia, who was the driver of one of the vehicles.

These circumstances contradict Garcia's statement to the district court during the 3 September 2009 hearing that he was an innocent driver who knew nothing of the drug deal. The district court did not abuse its discretion by finding, by greater weight of the evidence, that Garcia was involved in the attempted drug

12

transaction as more than an unwitting driver and that he accordingly violated the terms of his supervised release, as charged. The district court did not err in revoking his supervised release based on its finding that, with the exception of armed robbery, he had committed the crimes alleged in the revocation petition.

B.    *The Monitored Telephone Conversation*

Garcia argues that the district court improperly permitted Detective Lamprou to testify that he was the individual on the controlled call who negotiated the terms of the drug transaction with the CI. He argues that the government failed to authenticate Garcia's voice before seeking to admit Detective Lamprou's testimony identifying the unidentified individual as Garcia, as required by Fed. R. Evid. 901, and that the district court erred in allowing the detective to testify in that respect. Id. at 22-23. Garcia argues that Detective Lamprou's testimony about the monitored conversation "was classic hearsay in that [he] was purporting to testify about the truth of statements that took place outside the courtroom," and that, because the detective could not identify Garcia as the speaker, the statements were not admissible as an admission by a party-opponent under Fed. R. Evid. 801(d)(2)(A) or as statements made in furtherance of a conspiracy under Fed. R. Evid. 801(d)(2)(E). Appellant's Brief at 23-24.

Garcia argues for the first time that under Crawford v. Washington, 541 U.S.

13

36, 124 S. Ct. 1354 (2004), the Sixth Amendment's Confrontation Clause bars the admission of the CI's testimonial statements because the CI was not subjected to cross-examination. Finally, Garcia argues that Detective Lamprou's testimony violated Fed. R. Evid. 1002, which provides that the original of a recording is required to prove the contents thereof. Because the recording was not played at the hearing, Garcia argues that the only evidence of the conversation was the detective's second-hand summary, which violated the "best evidence" rule of Rule 1002.

Garcia acknowledges that the Federal Rules of Evidence do not apply in supervised release revocation proceedings, but argues that the court failed to conduct the required balancing test or make a finding of reliability before admitting hearsay testimony, as required by United States v. Frazier, 26 F.3d 110 (11th Cir. 1994). He asserts that the court's errors in this regard substantially prejudiced his rights because the court relied upon the improper testimony. He argues that because, absent the improper statements, the government did not prove a supervised release violation by a preponderance of the evidence, we should reverse the judgment revoking his supervised release. Id.

Although the Federal Rules of Evidence do not apply in supervised release revocation proceedings, the Supreme Court has held that "[d]efendants involved in

revocation proceedings are entitled to certain minimal due process requirements," including "the right to confront and cross-examine adverse witnesses." Frazier, 26 F.3d at 114 (citations omitted). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

Detective Lamprou's testimony was not hearsay. He directly monitored the controlled call and heard both ends of the conversation himself. This is not a situation of a CI repeating to a detective what the defendant told the CI out of the detective's earshot. Detective Lamprou's testimony about statements he heard on the monitored phone call was not hearsay.

The utterances that the unidentified individual made to the CI (and assuming there was evidence to tie Garcia to that individual) were admissible under Fed. R.Evid. 801(d)(2), which excludes admissions by a party opponent from the hearsay rule. Those statements were offered to prove only that Garcia was somehow involved in the conspiracy. Because no hearsay was involved, the district court did not have to assess the reliability of such hearsay or conduct the balancing test before considering the same under Frazier.

Any errors were harmless. Other information, summarized above, independently showed more than mere presence at the scene of a crime – it showed

15

that Garcia participated in the alleged drug conspiracy.  Specifically, he drove Quadra to a place where a drug transaction was to occur, he was found with a Taser and pepper spray in his lap, and authorities located a gun on the front floor of the car and duffle bags in the trunk containing duct tape and flex cuffs.  Moreover, he violated supervised release by committing state crimes previously, and had knowledge and intent necessary to commit a drug offense, as indicated by his underlying federal conviction in 2000.  Finally, he made a taped confession, which the government summarized in its opening statement.  Thus, given this information supporting a finding of guilt, it was irrelevant to the court's ultimate findings whether or not Garcia participated in the controlled call monitored by Detective Lamprou, or whether the detective's testimony or the recording itself were properly considered.

Finally, Garcia's argument that Crawford, which defines protections guaranteed by the Confrontation Clause, should extend to testimonial hearsay evidence in a supervised release revocation hearing fails.  The Sixth Amendment right to confront adverse witnesses is guaranteed only in "criminal prosecutions." U.S. Const. amend. VI.  The Supreme Court has held that a parole revocation hearing does not constitute a "criminal prosecution." Morrissey v. Brewer, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600 (1972), and our court has found "no significant

16

conceptual difference between the revocation of probation or parole and the revocation of supervised release." Frazier, 26 F.3d at 113-14.

C.    *Reasonableness*

Garcia argues that his sentence of 30 months imprisonment plus 24 additional months of supervised release was unreasonable.  Specifically, he argues that the district court did not adequately consider the § 3553(a) factors, "the questionable evidence used to establish the circumstances of the offense," or the applicable guideline range.  Appellant's Brief at 31-32.  Moreover, the court should have considered the assistance he rendered to an injured prison official as a mitigating factor in imposing sentence.  Garcia argues that a maximum sentence of 30 months was substantively unreasonable: "As argued at sentencing Mr. [Garcia] should have been granted credit for time served, as he had already served the mid-range of the recommended Chapter 7 guidelines."[3]  Id. at 32.

When appropriate, we review a sentence imposed upon the revocation of supervised release for reasonableness.  Sweeting, 437 F.3d at 1106-07.  Upon

---

[3]Although Garcia includes in his brief a reference to procedural reasonableness in an argument heading and in a final, conclusory sentence, he offers no argument that the court committed procedural error.  Accordingly, he has waived any claim as to the procedural reasonableness of his sentence.  See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).  It is also unclear whether Garcia challenges the reasonableness of his supervised release term.  Garcia does not mention his term of supervised release when he argues that his sentence was substantively unreasonable.  Appellant's Brief at 31-32.  Accordingly, he has waived any claim as to the substantive reasonableness of his supervised release.  See id.

17

finding by a preponderance of the evidence that a defendant violated a condition of release, a district court may – and sometimes must – revoke the term of supervision.  See id. at 1107.  The court may then "impose a term of imprisonment after considering certain factors set forth in 18 U.S.C. § 3553(a).  Section 3553(a) provides that district courts imposing a sentence must first consider, *inter alia*, (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; and (4) the kinds of sentences and sentencing range established by the Guidelines, and in the case of a violation of supervised release, the applicable Guidelines or policy statements issued by the Sentencing Commission."  Id.

"For sentences imposed upon revocation of supervised release, the recommended sentencing range is based on the classification of the conduct that resulted in the revocation and the criminal history category applicable at the time the defendant originally was sentenced to the term of supervision.  U.S.S.G. §§ 7B1.1, 7B1.4.  But because the Guidelines have always been advisory for sentences imposed upon revocation of supervised release, it is sufficient that there be some indication that the district court was aware of and considered the Guidelines, which requires the court to consider the sentencing range established

18

under the Guidelines." United States v. Campbell, 473 F.3d 1345, 1348-49 (11th Cir. 2007) (per curiam) (quotation marks and citations omitted) (emphasis omitted).

Here, the district court correctly found that Garcia violated the conditions of his supervised release by violating the terms of his supervised release in four ways. As noted above, the district court determined that Garcia's guideline range was 15-21 months of imprisonment and that he faced a maximum custodial term of 30 months and a maximum term of additional supervised release of 24 months. Because the district court found that Garcia possessed a firearm, it was required to revoke Garcia's supervised release and to impose a term of imprisonment. See 18 U.S.C. § 3583(g)(2).

Garcia's 30-month custodial sentence and two years of supervised release was substantively reasonable. The district court considered the parties' arguments and the § 3553(a) factors. Garcia's release offenses were serious and a term of imprisonment of 30 months arguably deters other defendants on supervised release. Neither Garcia's contention that the district court failed to take into account that he had saved the life of a prison official nor the government's assertion that the court concluded that it could not do so because the story was uncorroborated is supported by the record.

### III. CONCLUSION

Garcia appeals the revocation of his supervised release, arguing that the government failed to prove the violation by a preponderance of the evidence, that the district court improperly considered testimony, and that the sentence is substantively unreasonable. We hold that the district court did not abuse its discretion in finding that Garcia had committed the offense conduct; the disputed testimony was not hearsay and any error was harmless. Finally, the sentence imposed is substantively reasonable. Accordingly, we affirm the sentence.

**AFFIRMED.**